NO.  94-183

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

VERNON KILLS ON TOP,

     Petitioner and Appellant,

  v.

STATE OF MONTANA,

     Defendant and Respondent.

FILED

NOV 25 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Sixteenth Judicial District,
              In and for the County of Custer,
              The Honorable M. James Sorte, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

        Wendy Holton, Attorney at Law,
        Helena, Montana

        James Thomson (argued), Attorney at Law,
        Berkeley, California

     For Respondent:

        Hon. Joseph P. Mazurek, Attorney General,
        Clay Smith (argued), Solicitor, Attorney
        General's Office, Helena, Montana

Heard:  September 15, 1995

Submitted:  November 2, 1995

Decided:  November 25, 1996

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The petitioner, Vernon Kills On Top, was convicted of robbery, aggravated kidnapping, and deliberate homicide following trial by jury in the District Court for the Sixteenth Judicial District in Custer County on August 6, 1988. On September 8, 1988, he was sentenced to forty years in the Montana State Prison for robbery, and death for the kidnapping and homicide convictions. His conviction was appealed to this Court and affirmed in *State v. Vernon Kills On Top* (1990), 243 Mont. *56, 793* P.2d 1273, *cert. denied* (1991), *501* U.S. 1259.

On February 19, 1992, the petitioner filed a petition for postconviction relief pursuant to § 46-21-101, MCA, in the same District Court in Custer County. In that petition, he claimed fifteen separate grounds for relief. All but part of one claim were dismissed by the District Court by summary judgment. Part of the petitioner's second claim which was not dismissed by summary judgment was denied after an evidentiary hearing. In addition, the petitioner's motion to amend claims 2 and 11 and add claims 16-18, and his motions for investigative assistance, leave to conduct discovery, and a court-appointed psychiatrist, were all denied. The District court also denied petitioner's motion for reconsideration.

Vernon Kills On Top appeals from the District Court's orders which denied his amended petition for postconviction relief and his motion for reconsideration. We affirm the District Court in part,

reverse in part, and remand to the District Court for further proceedings consistent with this opinion.

The issues presented on appeal are as follows:

1. Did the District Court err when it denied the petitioner the opportunity to amend his petition for postconviction relief?

2. Did the District Court err when it denied the petitioner the opportunity to present evidence at a hearing in support of all but one of his claims that he received ineffective assistance of counsel?

3. Did the District Court err when it held that nine of the petitioner's claims were barred by the doctrine of *res judicata*?

4. Is the imposition of the death penalty based on a conviction for aggravated kidnapping and deliberate homicide disproportionate to the petitioner's conduct and therefore in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article II, Section 22, of the Montana Constitution, when the petitioner was not personally involved in and not present when injuries were inflicted which caused the victim's death?

5. Did the District Court err when it denied five of the petitioner's claims based on the procedural bar found at § 46-21-105, MCA, because they were not previously raised on appeal?

PROCEDURAL BACKGROUND

The petitioner, Vernon Kills On Top, raised the following grounds in his original petition for postconviction relief:

3

1. The District Court lacked jurisdiction over a homicide committed in the state of Wyoming.

2. The petitioner received ineffective assistance of counsel prior to trial, during trial, in the sentencing phase of his prosecution, and on appeal from his convictions for robbery, aggravated kidnapping, and deliberate homicide.

3. The District Court improperly excluded evidence pertaining to Diane Bull Coming's participation in the crimes for which he was convicted.

4. The jury which convicted him was improperly influenced when the deputy clerk of court and bailiff wore badges which urged "Take a bite out of crime."

5. The District Court erred when it refused to instruct the jury regarding lesser included offenses, including ordinary kidnapping.

6. The District Court erred when it instructed the jury regarding the effect of intoxication.

7. The District Court erred when, at petitioner's sentencing hearing, it considered evidence of prior criminal charges which had been dismissed and convictions which had been obtained without the benefit of defense counsel.

8. The sentencing hearing was unfair because it was based on a biased report from an uninformed and hostile probation officer.

9. The District Court erred when it considered petitioner's failure to testify in making its sentencing determination.

**10.** The District court failed to adequately consider **mitigating** evidence before imposing the death sentence.

11. Heinous acts of others were improperly attributed to the petitioner as aggravating circumstances in support of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article II, Section 22, of the Montana Constitution.

12. Imposition of the death penalty for aggravated kidnapping is unconstitutional.

13. The District Court violated individualized punishment notions central to the Eighth and Fourteenth Amendments when it sentenced the petitioner to death under the circumstances in this case.

14. The Montana Supreme Court's independent review of the petitioner's sentence was flawed by its erroneous assumption of aggravating facts and its disregard for other mitigating facts.

15. Based on the facts in this case, imposition of the death sentence was disproportionate, cruel, and unusual punishment.

On March 18, 1992, prior to any responsive pleading by the State of Montana, the petitioner moved to amend his petition to include allegations that his counsel had been ineffective based on political interests which were in conflict with his defense of the petitioner and based on his failure to cite authorities to the District Court.

The State of Montana, in its response to Vernon Kills On Top's amended petition, affirmatively alleged that **claims 1, 4, 5, 9-11,**

5

and 13-15 were barred by the doctrine of *res judicata*; and that claims 3, 6-8, and 12 were procedurally barred based on § 46-21-105(2), MCA. On March 30, 1992, the State moved for partial judgment on the pleadings based on those affirmative defenses. The State also sought dismissal of all but part of the petitioner's claim that he received ineffective assistance of counsel as a matter of law. The State conceded that petitioner's claim that he was denied the right to testify could only be resolved after an evidentiary hearing. On May 6, 1992, the District Court issued its notice that based on information submitted by the parties in support of and in opposition to the State's motion, which was in addition to that information included in the pleadings, the State's motion was converted to a motion for partial summary judgment pursuant to Rule 56, M.R.Civ.P.

On June 30, 1992, the District Court entered an order in which it set July 15 as the deadline for proposing amendments to the petition. The petitioner's proposed amendments to his petition were filed on July 14.

On March 30, 1993, the District Court granted the State's motion for partial summary judgment. It concluded that claims 1, 4, 5, 9-11, and 13-15 were barred by the doctrine of *res judicata*, and that claims 3, 6-8, and 12 were procedurally barred pursuant to § 46-21-105(2), MCA. It further concluded that all of petitioner's claims regarding ineffective assistance of counsel lacked merit as a matter of law, except for that claim in subparagraph (h) of claim 2 to the effect that the petitioner was denied the

opportunity to testify at his sentencing hearing. The District Court granted a hearing at which the parties were allowed to present evidence regarding the merits of claim 2(h). However, following that hearing, the District Court found that the petitioner had been informed of his right to testify and voluntarily chose not to do so. The court concluded that that decision was binding on his counsel.

On February 10, 1994, judgment was entered against the petitioner and in favor of the State regarding all claims made by the amended petition for postconviction relief. On March 14, 1994, the petitioner's motion for reconsideration was denied.

Specific facts which served as the basis for the petitioner's conviction and his sentence to death will be discussed where appropriate to the issues we now consider.

## STANDARD OF REVIEW

We review district court orders granting summary judgment, as we do district court conclusions of law, to determine if they are correct. *State v. Sullivan* (1994), 266 Mont. 313, 318, 880 P.2d 829, *832.*

We review a district court's findings of fact to determine whether they are clearly erroneous. *State v.* Bower (1992), 254 Mont. 1, 7, *833* P.2d 1106, 1110.

We review a district court's denial of a motion to amend the pleadings to determine whether the court abused its discretion. *Porter v. Galarneau* (1996), 275 Mont. 174, 188, 911 P.2d 1143, 1151-52;

*United Methodist Church v. D.A. Davidson, Inc. (1987)* , 228 Mont 288, 292, 74
P.2d 794, 797.

ISSUE 1

Did the District Court err when it denied the petitioner the opportunity to amend his petition for postconviction relief?

On June 30, 1992, the District Court entered an order in which it set July 15, 1992, as the deadline for proposing any further amendments to the petition for postconviction relief. On July 14, 1992, within the deadline set by the court, Vernon proposed amendments to his claims 2 and 11, and proposed adding claims 16-18. On March 30, 1993, the District Court denied Vernon's motion to amend his postconviction petition based on its determination that "the proposed amendments would be futile."

In his motion to amend his pleadings, Vernon sought to amend claim 2(b) to allege that his trial attorney was ineffective because he failed to investigate and discover Diane Bull Coming's prior acts of violence against men and acts of prostitution, and because he failed to obtain a psychiatric evaluation for Vernon. He sought to amend claim 11, regarding the required mental state for imposition of the death penalty, by adding reference to § 45-2-302, MCA,.

Proposed claim 16 sought the opportunity to allege newly discovered evidence based on the affidavit of Diane Bull Coming in which she questioned whether Vernon had actually consented to kill the victim. Claim 17 sought to allege multiple violations of *Brady v. Maryland* (1963), 373 U.S. 83, including the State's failure to

8

disclose Diane's allegation that she had been raped by a Custer County jailer, and other evidence that the victim had been mutilated by Diane. Finally, proposed claim 18 alleged a cumulative denial of due process based on all the circumstances alleged in previous claims.

A petition for postconviction relief is civil in nature. *State v. Black* (1990), *245* Mont. 39, 43, 798 P.2d 530, 532; *Coleman v. State* (1981), 194 Mont. 428, 433, 633 P.2d 624, 627. Therefore, in most instances the Montana Rules of Civil Procedure apply. In this case, because the postconviction relief statute does not specify a procedure for the amendment of a postconviction petition, we will apply Rule 15(a), M.R.Civ.P. That rule provides:

> A party may amend the party's pleading once as a matter of course at anytime before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires . . .

In this case, neither the District Court nor the State provide any justifiable basis for denying Vernon the opportunity to amend his petition for postconviction relief. The stated basis for denying the motion was its futility. However, the amended pleading would have set forth at least one basis for relief which this Court found controlling in Lester Kills On Top's claim for postconviction relief. *See Lester Kills On Top v. State* (1995), 273 Mont. 32, 45, 901 P.2d 1368, 1377

The amendment to **claim** 2(b) alleged that Vernon's trial attorney was ineffective for failing to adequately investigate the State's primary witness. We have held that failure to adequately investigate a case prior to trial could form the basis for a finding that counsel was ineffective and that when such an allegation is made, a hearing is necessary to determine whether in fact the allegation is true. *Fitzpatrick v. State* (1981), 194 Mont. 310, *318, 638* P.2d 1002, 1007.

Proposed claim 16 sought the opportunity to allege newly discovered evidence based on an affidavit of Diane Bull Coming in which she questioned whether Vernon had actually consented to kill the victim. Since his alleged consent to the **victim's** murder served as a partial basis for the District Court's imposition of the death penalty, and since newly discovered evidence is a justification for postconviction relief, this allegation, if true, could hardly have been considered futile. *In re J.R.T.* (1993), 258 Mont. 520, 522, 853 P.2d 710, 711; *State v. Greeno* (1959), 135 Mont. *580, 586, 342* P.2d 1052, 1055-56.

Claim 17 sought to allege multiple violations of *Brady,* including the State's failure to disclose Diane's allegation that she had been raped by a Custer County jailer. As previously pointed out, this Court has already concluded, in response to Lester's claim for postconviction relief, that this *Brady* violation was cause to set aside Lester's death penalty. A similar **claim** could not have been futile for Vernon when Diane Bull Coming was the only witness who even linked Vernon to Etchemendy's death.

10

The proposed claim 18 would have alleged cumulative denial of due process based on all the circumstances alleged in the previous claims. Cumulative error can serve as a basis for reversal, even when individual errors alone would not serve as a sufficient basis for reversal. *State v. Grant* (1986), *221* Mont. 122, 137, 717 P.2d 562, *572; State v. Close* (1981), 191 Mont. 229, 245, 623 P.2d 940, 948. Therefore, it cannot be said that this allegation, if established, would have been futile in Vernon's effort to receive postconviction relief.

The dissent concurs that most amendments should have been allowed, but contends that the amendment to the petitioner's 11th claim should have been disallowed because it was futile. The petitioner sought to amend claim 11 by adding reference to § *45-2-302*, MCA, regarding the required mental state for finding one person accountable for the conduct of another. The point of claim 11 was that sentencing Vernon to death for torture committed by Lester violated the rule of proportionality established in *Enmund v. Florida* (1982), 458 U.S. 782. Section 45-2-302(1), MCA, provides that before a person can be legally accountable for the conduct of another, he or she must share the mental state described in the statute defining the offense. While this is not the subsection pursuant to which the petitioner was charged, he presumably sought to argue by analogy that he could not be accountable for Lester's torture in order to satisfy the aggravating circumstance requirement for imposition of the death penalty. Since, as discussed later in this opinion, there is merit to the petitioner's

11

proportionality argument, attempts to fortify the argument were not futile as a matter of law at the pleading stage.

Whether one person lives and another dies for conduct alleged to have occurred during the same transaction should not hinge on a district court's discretionary denial of a motion to amend a petition for postconviction relief. The District Court's denial of Vernon's motion to amend is particularly unreasonable in light of Rule 15(a)'s admonition that "leave shall be freely given when justice so requires," and based on the facts that in this case Vernon's motion to amend his petition was filed by the date the District Court had established for the amendment and no prejudice to the State was established which would justify its denial.

For these reasons, we conclude that the District Court erred when it denied Vernon Kills On Top's motion to amend his amended petition for postconviction relief.

ISSUE 2

Did the District Court err when it denied the petitioner the opportunity to present evidence at a hearing in support of all but one of his claims that he received ineffective assistance of counsel?

In his petition for postconviction relief, Vernon Kills On Top alleged that he received ineffective assistance of counsel prior to trial, during trial, in the penalty phase of his case, and on appeal. The District Court denied Vernon the opportunity to present evidence at a hearing in support of all but one of his claims of ineffective assistance, and dismissed all but one claim

by summary judgment. In order to avoid summary judgment, a party claiming ineffective assistance of counsel in a petition for postconviction relief bears the burden of proving facts justifying relief by a preponderance of the evidence. *State v. Peck (1993)*, *263* Mont. 1, 3-4, 865 P.2d 304, 305; *Yother v. State* (1979), 182 Mont. 351, *355*, 597 P.2d 79, 82.

Vernon alleged that his counsel was ineffective for the following reasons:

1. He had a conflict of interest based on his candidacy for county attorney which was inconsistent with his defense of Vernon.

*2.* He had a strong antipathy for criminal defendants, as publicly stated in a book that he authored.

*3.* He made numerous errors during trial and on appeal.

*4.* He associated with the victim's family during a party at a local hotel following Vernon's conviction.

*5.* He failed to have venue changed from Billings and failed to conduct individual *voir dire* once the trial commenced in Billings.

*6.* He failed to adequately investigate Diane Bull Coming.

7. He failed to take advantage of numerous sources of impeachment of Diane Bull Coming from Lester Kills On Top's trial, or to even order the transcript of her testimony.

*8.* He called a witness whose testimony was in fact more harmful than helpful to Vernon's case.

9. He failed to object to improper closing argument.

10. He failed to object to improper jury instructions regarding intoxication and flight.

13

11. He failed to adequately investigate and discover mitigating evidence prior to the penalty phase of Vernon's case.

12. He pressured Vernon into not testifying at his sentencing hearing.

In the amended petition for postconviction relief, Vernon also alleged that his counsel was ineffective for failing to cite leading authority on the court's duty to instruct the jury on lesser included offenses and on the court's improper use of Vernon's silence against him at the time of sentencing. Finally, Vernon moved to amend his petition to allege that his counsel was ineffective because of his failure to obtain a psychiatric evaluation of Vernon.

Attached to the petition for postconviction relief, or provided later, were numerous documents, including affidavits from several attorneys which supported some, but not all of Vernon's allegations.

A hearing was granted by the District Court during which Vernon was allowed to submit evidence in support of his claim that he had been prevented by his trial counsel from testifying at either his trial or his sentencing hearing. During that hearing, a copy of a book authored by his trial counsel and entitled <u>Death Sentence, Murder on the Prairie</u> was admitted as an exhibit. In that book, the author described another murder case which he had handled as a prosecuting attorney. However, Vernon's postconviction attorney was precluded from asking him questions about the book in an effort to establish anti-defendant sentiment

on his part.  Specifically, Vernon sought to introduce and have explained the following passages from his trial attorney's book which had been published in 1983:

> A theme of the book is the war between good and evil, represented by law enforcement versus those who would frustrate law enforcement.  The high intensity and many dimensions of that struggle extend from the Montana prairie to the highest court, from investigative science and psychoanalysis to prison breakouts and a kidnap-rape-murder.
>
> Ultimately each individual, whether law officer, attorney, juror, judge, justice or reader, decides for himself which side must win and thereby influences the result.
>
> Criminal prosecution at its best creates a naked struggle between good and evil.  The good forces use their weapons of scientific investigation, exposure of the truth at public trials and in the media, and the threat and use of punishment against the wicked.  The evil forces counter with distortion and lies, secrecy, delay and every device that diminishes the good weapons.  Can we doubt that God is involved in these titanic clashes?
>
> It is frustrating to see the evil force apparently succeed, as murderers and other criminals go undetected or are freed on technicalities, and big lies masquerade popularly as the truth.  It is most unfortunate in capital cases to have the federal court system duplicate the already redundant, multiple reviews of the state court.  Since we have so little faith in our courts, and since our courts have so little faith in themselves, it is not surprising that our courts are so ineffective.
>
> What a shame that Peggy Harstad's murderers could formulate and carry out her death in a few hours, but our court system waits ten years or more to respond with equal justice.

Following the District Court's hearing, findings of fact and conclusions of law were entered pursuant to which that part of

15

Vernon's ineffective assistance claim which alleged that he had been denied the opportunity to testify was denied.

The State contends that the District Court properly dismissed all but one of Vernon's ineffective assistance of counsel claims by summary judgment because before he was entitled to a hearing he had to make a substantial showing of ineffective assistance by use of affidavits, records, or other evidence as required by § 46-21-104(1)(c), MCA, which provides:

> (1) The petition for postconviction relief must:
> . .
> (c) have attached any affidavits, records, or other evidence supporting its allegations or state why the evidence is not attached.

This Court has interpreted § 46-21-104(1)(c), MCA, to require that a claim of ineffective assistance of counsel must be grounded on facts in the record and not merely on conclusory allegations. *Eiler v. State* (1992), 254 Mont. 39, 42-43, 833 P.2d 1124, 1127; *State v. McColley* (1991), 247 Mont. 524, 527, 807 P.2d 1358, 1360.

The State further contends that the petition's general conclusory allegations did not meet the two-part test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, for proof of an ineffective assistance of counsel claim. *Strickland's* two-part test requires that the defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Strickland*, 466 U.S. at 687. Pursuant to *Strickland*, a defendant alleging ineffective assistance of counsel must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the

16

result of the proceeding would have been different.  *Strickland, 4 b b* U.S. at 694.

Under similar circumstances in *Fitzpatrick v. State* (1981), 194 Mont. 310, 638 P.2d 1002, we reversed a district court's summary dismissal of a petition for postconviction relief based on ineffective assistance of counsel.  In that case we held that:

> We determine that an evidentiary hearing is necessary on petitioner's claim that he was denied effective assistance of counsel both at trial and at sentencing. In his petition, *Fitzpatrick* alleged that his court-appointed counsel failed to adequately investigate and prepare a defense, and that he was unfamiliar with critical areas of the applicable law.  He cited numerous and substantial facts to support his allegations, which were found to be speculative and conjectural by the district judge.
>
> Petitioner is entitled to have at his trial "effective assistance of counsel acting within the range of competence demanded of attorneys in criminal cases." *State v. Rose* (1980), [187 Mont. 74,] 608 P.2d 1074, 1081, 37 St. Rep. 642, 649-50.  From the information presented in Fitzpatrick's petition, we cannot say, as the district judge did, that "the files and records of the case conclusively show that the petitioner is entitled to no relief . ."  Section 46-21-201(1), MCA.  Many of the errors of which petitioner complains involve failures of counsel to act, i.e., omissions rather than commissions, and a mere review of the record cannot show that petitioner is entitled to no relief on these grounds.
>
> We find an abuse of discretion in the district judge's dismissal of these claims.  We do not hold that petitioner was denied effective assistance of counsel, but we do find that his allegations were sufficient to require an evidentiary hearing on the issue.

*Fitzpatrick,* 194 Mont. at 318, 638 P.2d at 1007.

Likewise, in this case several of Vernon's allegations that he received ineffective assistance of counsel were sufficiently articulated and documented that a hearing was required.  We hold that he was entitled to a hearing regarding four of his claims:

17

First, we hold that Vernon is entitled to a hearing based on two of his claims of conflict of interest. Specifically, we hold that Vernon's claims that his attorney had a conflict of interest based on (1) his campaign for the office of county attorney which was allegedly based on a promise to crack down on crime, and (2) his hostility toward criminal defendants as evidenced by his book entitled <u>Death Sentence, Murder on the Prairie,</u> if true, may have deprived Vernon of his Sixth Amendment right to the effective assistance of counsel. The Sixth Amendment guarantee comprises both the right to reasonably competent counsel and the right to that counsel's undivided loyalty. *Fitzpatrick v. McCormick* (9th Cir 1989), 869 F.2d 1247, *1251; Mannhalt v. Reed* (9th Cir. 1988), 847 F.2d *576, 579.* The United States Supreme Court enunciated the standard for establishing a violation of the Sixth Amendment based on an attorney's conflict of interest in *Cuyler v. Sullivan* (1980), *446* U.S. *335, 348.* In *Cuyler,* the Court stated that in order to establish a Sixth Amendment violation based on conflict of interest, a defendant must show that (1) an actual conflict of interest existed, and (2) that actual conflict adversely affected his lawyer's performance. *Cuyler,* *446* U.S. at 348. In this case, although Vernon presented documentation of his attorney's apparent conflict of interest, we hold that a hearing is necessary to determine the extent of that conflict and to determine whether the conflict adversely affected his lawyer's performance in either the trial, the sentencing, or the appeal.

Second, we hold that Vernon is entitled to a hearing based on his claims that (1) his attorney failed to take advantage of the transcript from Lester's trial which allegedly included numerous opportunities to impeach Diane Bull Coming, and (2) his attorney failed to adequately investigate Diane's background prior to trial and therefore was not prepared to adequately cross-examine her at the time of trial. It is well established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. To that end, courts have long recognized that an attorney's failure to investigate potential defense witnesses may fall below the level of competent representation required by professional standards and the United States Constitution. see, e.g., *Code v. Montgomery* (11th Cir. 1986), 799 F.2d 1481, 1483; *Gomez v. Beto* (5th Cir. 1972), 462 F.2d 596, 597. Indeed, "[o]ne of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior to trial." *Magill v. Dugger* (11th Cir. 1987), 824 F.2d 879, 886. We hold therefore that a hearing is required in this case to determine whether Vernon was deprived of a fair trial by virtue of his counsel's failure to adequately investigate Diane Bull Coming prior to trial and to make use of Diane's prior trial testimony during cross-examination of her at Vernon's trial.

We conclude that the remaining allegations of ineffective counsel are either inadequately supported in Vernon Kills On Top's petition for postconviction relief, or relate to the sentencing

phase, and therefore, based on the later conclusions in this opinion, are no longer relevant.

Therefore, we reverse in part and affirm in part the District Court's order which dismissed Vernon Kills On Top's claim that he received ineffective assistance of counsel, and we remand this case to the District Court for an evidentiary hearing at which the petitioner is entitled to present evidence in support of his remaining claims that he received ineffective assistance of counsel.

ISSUE 3

Did the District Court err when it held that nine of the petitioner's claims were barred by the doctrine of *resjudicata?*

The doctrine of "[r]*es judicata* bars reconsideration in a post-conviction relief proceeding of claims previously raised and considered on direct appeal." *Hawkins v. State* (1990), *242* Mont. 348, *351,* 790 P.2d 990, 992. The doctrine of *resjudicatn* has, in fact, been extended to petitions for postconviction relief in death penalty cases in spite of the argument that "[t]he Due Process clause of the Fourteenth Amendment requires greater reliability of judgments in capital cases." *Fitzpatrick v. State* (1981) , 194 Mont. 310, *317, 638* P.2d 1002, 1006.

This Court has cited the policy considerations of judicial economy and judicial finality as the basis for the doctrine of *res judicata*. See, *e.g., State v. Block* (1990), 245 Mont. 39, 44, 798 P.2d 530, 533; *State v. Perry* (19881, 232 Mont. 455, 463, 758 P.2d 268, 273.

*20*

However, the doctrine of *res judicata*, *as* it applies to postconviction relief proceedings, has been judicially adopted and is not provided for by statute in Montana. In fact, the Montana Legislature has specifically chosen not to a adopt the statutory codification of *res judicata* set forth in the Uniform Post-Conviction Relief Act.[1]

As the United State Supreme Court stated in *Sanders v. United States* (1963), 373 U.S. 1:

> The judge is permitted, not compelled, to decline to entertain [a successive *habeas corpus* application on previously litigated grounds], and then only if he "is satisfied that the ends of justice will not be served" by inquiring into the merits.

*Sanders*, 373 U.S. at 12:[2]

The criteria for the application of the doctrine of *res judicata* which is followed in Montana was most recently set forth in *State v. Baker* (1995), 272 Mont. 273, 282, 901 P.2d 54, 59, where this Court stated:

> We will apply the bar of res judicata to the re-litigation of issues already determined on direct appeal if:

---

[1]Section 12 of the Uniform Post-Conviction Procedure Act (revised in 1980) provides for an affirmative defense of *resjudicnta* by allowing summary denial of an application for postconviction relief "on the ground that the same claim or claims were fully and finally determined in a previous proceeding." 11A Uniform Laws Annot. 247, 261 (1995). Montana has not adopted § 12.

[2]Although *Sanders* is a *habeas corpus* case and is governed by federal statute (28 U.S.C. § 22441, this Court has expressly adopted the *Sanders* test for application of *resjudicnta in State v. Baker* (1995), 272 Mont. 273, 282, 901 P.2d 54, 59.

21

(1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

In this case, we conclude that, with the exception of those claims which challenge the imposition of the death sentence based on disproportionality pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, and Article II, Section 22, of the Montana Constitution, the ends of justice are not served by reaching the merits of the petitioner's claims a second time. Therefore, the District Court's conclusion that petitioner's claims numbered 1, 4, 5, 9, 10, and 14 are barred by *resjudicata* is affirmed. To the contrary, the "ends of justice" do compel reconsideration of the petitioner's death sentence in light of this State's constitutional prohibition against the infliction of cruel or unusual punishments. Mont. Const., art. II, § 22. As the U.S. Supreme Court has noted: "Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged." *Sanders,* 373 U.S. at 8. This sentiment was recently echoed by the Indiana Supreme Court in a similar felony murder death penalty case when that court stated:

> With due respect for the doctrine of *resjudicata* this Court has always maintained the option of reconsidering earlier cases in order to correct error. "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work manifest injustice.'" <u>Finality and fairness are both important</u>

22

<u>goals. When faced with an apparent conflict between</u> <u>them, this Court unhesitatingly chooses the latter.</u>

*State v. Huffman* (Ind. 1994), 643 N.E.2d 899, 901 (emphasis added; citation omitted.)

In addition, the Montana Supreme Court has always recognized an exception to the doctrine of *res judicata* under circumstances which are present in this case. We noted that exception in *State v. Zimmerman* (1977), 175 Mont. 179, 185, 573 P.2d 174, 178, when we held that:

> In any event an exception to this general rule exists where the case must be remanded to the District Court for further proceedings because of reversal on an unrelated issue. In such case this Court may correct a manifest error in its former opinion and announce a different ruling to be applied prospectively to future proceedings in the case. This exception to the general rule is recognized in Montana at least since 1955.

in *Lester Kills On Top v. State* (1995), 273 Mont. 32, 901 P.2d 1368, we vacated the death sentence imposed on Lester Kills On Top based on the State's failure to disclose potentially exculpatory information about its principal witness, Diane Bull Coming, in violation of *Brady v. Maryland* (1963), *373* U.S. 83. Specifically, we held that the State had a duty to disclose Bull Coming's allegation that she was raped by a jailer while in custody in Custer County for charges related to this case and that she had previously been convicted of misdemeanor assault, misdemeanor theft, and other misdemeanors. *Lester Kills On Top,* 273 Mont. at 43, 901 P.2d at 1375. We concluded that while Lester's conviction was sufficiently supported by other evidence that the outcome would probably not have been different even with the exculpatory evidence, we could not say the same about the punishment which was imposed. We held that:

23

> Focusing on Bull **Coming's** undisclosed rape allegation and
> on Bull Coming's undisclosed criminal record, which
> included convictions for misdemeanor assault and theft,
> we conclude that our confidence in the sentence is
> undermined. . . .
>
> .     We hold that there is a reasonable probability
> that, had Bull Coming's rape allegation and criminal
> record been provided to Appellant, the result of the
> sentencing proceeding could have been different.
> Therefore, we vacate Appellant's sentences imposed for
> robbery, aggravated assault, and deliberate homicide and
> remand to the trial court for resentencing.

*Lester Kills On Top,* 273 Mont. at 45, 901 P.2d at 1376-77.

Our holding in Lester's case requires that no less be done in Vernon's case. Bull Coming was the principal witness who linked Vernon to the kidnapping of John Martin Etchemendy, Jr., and the person on whose testimony Vernon's death sentence was largely based.

Therefore, we conclude that for a second reason we are not precluded from reconsidering the constitutionality of petitioner's death sentence pursuant to this petition for postconviction relief. Since this case must, at a minimum, be remanded to the District Court for resentencing based on the State's violation of *Brady,* 373 U.S. 83, and pursuant to our decision in *Lester Kills On Top,* 273 Mont. 32, 901 P.2d 1368, the District Court **may** correct any **former** error in its or our former opinion and apply a different rule prospectively to future proceedings in this case. *Zimmerman*, 175 Mont. at 185, 573 P.2d at 178.

## ISSUE 4

Is the imposition of the death penalty based on a conviction for aggravated kidnapping and deliberate homicide disproportionate

24

to the petitioner's conduct and therefore in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article II, Section 22, of the Montana Constitution, when the petitioner was not personally involved in and not present when injuries were inflicted which caused the **victim's** death?

At this point it is necessary to review the evidence which led to Vernon Kills on Top's conviction for aggravated kidnapping and deliberate homicide and his sentence to death for those **crimes.** While our prior opinion accepted the testimony of Diane Bull Coming at face value, and based our result largely on that testimony, a closer review of the record is necessary.

On October 17, 1987, Vernon and Lester Kills On Top, Doretta Four Bear, and Diane Bull Coming were drinking at the Golden West Lounge in Miles City, Montana. After they left the bar, had gotten in their vehicle, and were about to leave, they were approached by John Martin Etchemendy, Jr., who stated that he had misplaced his vehicle and asked them for their help finding it. They agreed to help him and he got in the back seat of their vehicle.

After a brief effort to locate Etchemendy's vehicle, Diane spoke to the Kills On Top brothers in the language of the Northern Cheyenne and Vernon, who was driving, reversed directions and headed out of town. When he asked where they were going, Etchemendy was told by Diane that they were headed to Broadus. According to Doretta, Etchemendy originally agreed, but subsequently changed his mind after being assaulted by Lester and Vernon.

25

According to Doretta, several altercations occurred involving Lester, Vernon, and Etchemendy between Miles City and Broadus. During one fight involving Lester and Etchemendy in the back seat of the vehicle, Diane removed Etchemendy's wallet from his pocket. At that time, Lester was holding him and Vernon was driving the vehicle.

Although Doretta testified that Vernon participated in beating Etchemendy during the trip, including the first altercation, she stated in her first written statement immediately following the incident that only Lester had initially fought with "the white guy." She testified at trial that at some point during the trip Etchemendy was told by Vernon to take his clothes off and, by someone she could not identify, to get in the trunk. However, prior to trial in her written statement she stated that it was Lester who told the victim to take his clothes off and get in the trunk.

Doretta also told Vernon's attorney, in the presence of her attorney and the Deputy County Attorney, that she did not actually see Vernon hit or strike Etchemendy and that during the second scuffle outside the vehicle after leaving Miles City she saw Vernon standing there while Etchemendy wrestled on the ground with Lester.

After Etchemendy entered the trunk, Doretta never saw him again. When the group arrived in Rabbit Town on the Northern Cheyenne Reservation, Doretta left the group and knew nothing more about what occurred later that day or the next day.

26

Flora Parker was a friend of Doretta. She testified that Doretta arrived at her house early in the morning on October 17 after she left the Kills On Top brothers and Diane Bull Coming. She related what Doretta told her at that time. Doretta's statements at that time apparently placed most responsibility for kidnapping and beating Etchemendy on Lester and Diane and attributed little culpability to Vernon.

While in Ashland, the group picked up LaVonne Quiroz. She testified that when they left Ashland she was driving; Vernon was in the front seat, and they were returning to Miles City until Lester awoke and told them to turn around and proceed in the other direction. She first learned that there was someone in the trunk after they had arrived in Broadus and Etchemendy informed them that he had to go to the bathroom. She stated that he was allowed to do so outside of Biddle and described several other stops between Broadus and Gillette. During these stops she described Lester and Diane as the principal actors and Vernon as a passive participant. She also indicated that Lester and Diane were principally responsible for cashing Etchemendy's checks on the way to Gillette and that some of the money they received was distributed to her and Vernon.

LaVonne testified that after they had arrived in Gillette, while Etchemendy was still in the trunk of their vehicle, Lester took the keys from her and left with Diane. Vernon was surprised and angry that they had left. She and Vernon were later called by Diane and told to meet them at another location in Gillette.

27

However, when they did meet them it was apparent that Etchemendy was dead.

Before Lester and Diane left with the vehicle, Etchemendy was alive and sufficiently active that he was creating a disturbance in front of the bar where the group had stopped to drink. They were sufficiently concerned about the disturbance that LaVonne moved the vehicle around to the alley behind the building.

LaVonne testified that at no time during the entire trip did Vernon express any interest in hurting the victim and that at one point while in Gillette Lester had agreed with Vernon to take Etchemendy back to Miles City, but that at that point Diane got mad at both of them. LaVonne testified that it was originally Diane's idea to treat Etchemendy as a hostage and that when the brothers discussed returning him to Miles City, she stated: "Let's use him for all he's got."

LaVonne testified that Vernon was not present when Etchemendy was killed and had no idea that it was going to happen.

Lester Kills On Top also testified at his brother's trial. He stated that it was he, not Vernon, who fought with Etchemendy between Miles City and Ashland, that it was Diane who ordered Etchemendy into the trunk, and that it was Diane's idea to kill the victim. He testified that Vernon had never expressed any interest in hurting Etchemendy while in Gillette and had no knowledge of what he and Diane planned to do when they left the Lobby Bar with Etchemendy in the trunk of the vehicle.

Prior to testifying in this case, Diane Bull Coming, who by all other accounts was the principal actor, entered into a plea agreement with the State pursuant to which she pled guilty to the offense of robbery and the State agreed to recommend a maximum penalty of forty years. As part of the plea agreement, she agreed to testify in the two Kills On Top trials.

At the time she entered into the seven or eight page plea bargain agreement, she had been charged with robbery and aggravated kidnapping and she knew the possible penalty was death or a life sentence. Pursuant to the plea agreement, she was classified a nondangerous offender for purposes of parole, which meant that she was eligible for parole in eight years. She had also been advised that with good time she may serve less than that.

Another part of the plea agreement provided that if she changed her testimony from what she had indicated it would be prior to entering into the plea agreement, the agreement would be revoked and the prior charges reinstated.

Diane's description of the chronology of events was generally consistent with what has already been described, except that she minimized her own culpability and placed greater blame for harm to the victim on the Kills On Top brothers. Diane was also the only witness who was present at the time when Etchemendy was killed and described how his life was ended.

Several of the facts related by Diane were relied on by this Court in its prior opinion. For example, she stated that it was Vernon, not her, who went through Etchemendy's wallet in search of

29

credit cards and money; that Vernon participated in at least one of Etchemendy's beatings and in another altercation with Etchemendy on the way to Ashland; and that Vernon agreed with Lester at some point when Lester exclaimed that because Etchemendy could identify them, "we're going to have to kill him."

However, Diane's testimony was riddled with inconsistencies. She also testified that it was Lester, not Vernon, who forced Etchemendy into the trunk of the vehicle; she testified that Vernon, on occasion, inquired of Etchemendy about his well-being; and that when Etchemendy's checks were forged and used to purchase drinks and groceries, Vernon remained in the vehicle.

Most significantly, Diane testified that when Lester told Vernon, while in the bar in Gillette, that they had to get rid of Etchemendy, Vernon asked him to wait. She testified that when Lester brought it up again, Vernon again asked him to wait but that Lester accused him of stalling and demanded the keys to the vehicle. She testified that when Vernon produced the keys she and Lester left the bar, headed to a rural gravel road, and at that location Lester severely beat the **victim** and caused the injuries which ultimately led to his death. However, when they returned to Gillette Etchemendy was apparently still alive. It was at that point that Diane, according to her testimony, called Vernon and requested that he rejoin them. He asked whether Etchemendy was still alive and was told that he was. Only after getting off the phone was she advised by Lester that Etchemendy was now dead.

30

According to Diane she passed out a short time later and the next thing she remembers was when she awoke and was in the vehicle on the interstate highway heading back to Montana.

Based on even Diane's testimony, Vernon Kills On Top was not present when Etchemendy was killed, and he did not participate in any act which caused Etchemendy's death. While she did testify that on two separate occasions he agreed that something would have to be done with the victim, she also testified that he sought to postpone any further harm to the victim and that after his expression of reluctance, she and Lester took the victim to another location where Lester performed the murderous act himself.

Even that part of Diane's testimony which suggested Vernon's acquiescence in Etchemendy's murder is questionable in light of her affidavit filed in this proceeding in which she states:

> In regard to the time when the victim's blindfold was removed, Lester was hollering at everyone and Lester was giving everybody orders. When Vern took the blindfold off the victim, Lester got mad and said now he knows what we look like so we have to kill him.
>
> Vern grunted and I, at the time, interpreted this as agreement. In response to a question by Mr. Ranney, I agree that it is possible that my interpretation could have been wrong.

On cross-examination, Diane stated that at no time while Etchemendy was in the trunk of the group's vehicle did Vernon ever strike him, injure him, or take anything of monetary value from him. She agreed that he never initiated talk of murder other than in response to Lester and then he said "later." She stated that during conversations with Lester after Etchemendy's death, Lester took credit for the beatings and the killing of Etchemendy.

31

From this Court's thorough review of the record in this case, it is undisputed that Vernon Kills On Top was not present at and did not participate in the infliction of injuries which caused the death of John Martin Etchemendy, Jr. Furthermore, any evidence that Vernon had any intent to kill Etchemendy is at best equivocal and unpersuasive. The only credible evidence is to the contrary.

The dissent criticizes the **majority** opinion for minimizing the evidence about the extent of Vernon's participation in Etchemendy's death, and concentrating primarily on the testimony of Diane Bull Coming. The problem with the concern expressed by the dissent is that the testimony of Diane Bull Coming is the only evidence which linked Vernon Kills On Top to the death of John Martin Etchemendy, Jr.

In addition, the dissent repeatedly refers to factual **matters** in the record which have been ignored by the majority. However, what is clear from the dissent's recitation of the facts is that the author of the dissent has not personally reviewed the record to which the author refers, but instead merely recites this Court's prior characterization of the record which was anything but complete or accurate.

The author of the majority opinion has personally reviewed every line of the extensive record on which the jury's verdict and the District Court's sentence were based, and can personally vouch for the accuracy of every factual characterization in the majority opinion.

The following are several examples of inaccuracies found in this Court's previous opinion which are simply parroted by the dissent without further investigation or inquiry.

The dissent contends that Vernon Kills On Top participated in homicide committed by means of torture. However, nowhere in the record is there any evidence that Vernon Kills On Top participated in causing John Etchemendy's death. Nor is there any evidence that Vernon, **at** any **time,** tortured Etchemendy. We have previously approved the following definition of the term "torture":

> Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:
>
> (a) extort anything from such person;
>
> (b) or to persuade such person against his or her will; or
>
> (c) to satisfy some other untoward propensity of the assailant.

*State v. McKenzie III* (1980), 186 Mont. 481, 509, 608 P.2d 428, 445.

The District Court concluded that Lester Kills On Top had tortured Etchemendy by the brutal manner in which he caused his death. However, even that conclusion was incorrect, based on our prior definition. Lester killed his victim in a brutal and **clumsy** fashion which surely resulted in a great deal of suffering. But he killed him to eliminate him as a witness, not to extort anything from him or persuade him to do anything. No one has alleged that subsection (c) is applicable. Furthermore, Vernon did not participate in the conduct which caused Etchemendy's death, and was not present at the **time** the acts occurred. The District Court

*33*

first mischaracterized Lester's acts as torture, and then attributed them to Vernon by some unstated notion of accountability. However, pursuant to the individualized treatment required by statute in Montana, and rules of proportionality required by the United States and Montana Constitutions, the propriety of a death sentence must be evaluated based on the conduct of Vernon, and not by attributing to him the conduct of some other person which he neither participated in nor approved.

The dissent contends that Vernon was "directly involved in the serious beating of the victim" which was "so severe it could have caused death even absent further infliction of physical violence." Neither is that correct. Dr. Robert Deters, the pathologist who performed an autopsy on Etchemendy and testified on behalf of the State, expressed the opinion that the cause of death was extensive and severe head injuries--specifically a cluster of five injuries on the left side of Etchemendy's head which crushed his skull. It was his opinion that the injury was caused by a rounded object like a stick or a bat. The only one who ever struck Etchemendy with any object other than his fist or foot was Lester Kills On Top.

Deters did testify that he also observed a subdural hematoma which had been caused prior to the fatal blows and which could have been caused by blows from hands or feet. However, he stated that before a subdural hematoma is lethal, it requires an accumulation of fifty millimeters of blood, and that in this case, even though any beatings in which Vernon participated occurred twelve hours prior to death, only twenty millimeters of blood had accumulated.

34

In this case, the subdural hematoma observed could not have caused death unless combined with other injuries.

The dissent contends that after beating Etchemendy, Vernon participated in placing him in the trunk of the vehicle where he did nothing for him in the ensuing twelve-hour period. However, neither is that contention (again lifted from the previous opinion) supported by the record. Whether Vernon had anything to do with placing Etchemendy in the trunk is anything but clear from the record. However, while Etchemendy was in the trunk, it was Vernon who let him out to go to the bathroom; Vernon who checked on his condition; and Vernon who incurred his brother's wrath by removing Etchemendy's blindfold so that he could go to the bathroom.

The dissent contends that Vernon lifted the victim's wallet, cashed his checks, and distributed the proceeds. The only reliable evidence is that Diane Bull Coming confiscated Etchemendy's credit card and that Diane and Lester cashed Etchemendy's checks and divided the money. While a portion of the money was given to Vernon, he misplaced it, and even that portion was subsequently retrieved by Diane. Neither is the dissent correct when it repeats the allegation from this Court's previous opinion that Vernon did nothing in the pre-murder stages to prevent the homicide. According to even Diane's testimony, Vernon repeatedly stalled suggestions that Etchemendy be murdered.

The dissent contends that the majority opinion is "retrying" matters here. The dissent mistakenly assumes that by characterizing the evidence, the majority opinion is somehow contrary to the

jury's verdict.  However, the jury made no findings of fact which could be inconsistent with those recited in the **majority** opinion, the jury simply returned a verdict that Vernon was guilty of robbery, aggravated kidnapping, and deliberate homicide.  The majority opinion has done nothing to alter that verdict.

The only findings of fact entered in this case were those made by the District Court in support of its imposition of the death penalty.  However, by statute, this Court is given a very clear responsibility to review a district court's findings in support of the death penalty, and that review is not limited to a determination of whether there is any evidence to support the district court's findings, as was suggested by this Court's prior opinion and is now asserted by the dissent.

In the first place, the substantial evidence standard is not the standard by which we review a district court's findings of fact.  We held in *Interstate Production Credit Association v. DeSaye (1991)*, *250* Mont. 320, *820* P.2d 1285, that we will review a district court's findings of fact for the following criteria:  (1) the Court will determine whether the findings are  supported by substantial evidence;  (2) if the findings are  supported by substantial evidence,  the Court will determine if the trial court has misapprehended the evidence; and (3) if the findings are supported by substantial  evidence  and  that  evidence  has  not  been misapprehended,  this Court may still find "a finding is 'clearly erroneous' when, although there is evidence to support it, a review of  the  record  leaves  the  court  with  the  definite  and  firm

conviction that a mistake has been committed." *DeSaye*, 250 Mont. at 323, 820 P.2d at 1287 (citing *United States v. United States Gypsum Co.* (1948), 333 U.S. 364).

However, our statutory obligation to review a district court's findings in support of a death penalty is even broader than the clearly erroneous standard. This Court's statutory obligation for the independent review of a death sentence is set forth in § 46-18-310, MCA, which provides:

> The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:
> (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
> (2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 46-18-303 and 46-18-304; and
> (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration.

(Emphasis added.)

In this case, the District Court made several findings which it relied on for the imposition of a death sentence which clearly were not "supported by the evidence." For example, the District Court found, as one of two aggravating circumstances which justified imposition of the death penalty, that: "The offense was Deliberate Homicide and was committed by means of torture."

However, for reasons previously stated, Etchemendy's death was not committed by means of torture. That finding was not supported by any evidence, regardless of what standard we apply.

37

Furthermore, for reasons previously noted, the District Court's findings that Vernon helped strip and place the victim in the trunk and agreed that the victim had to die, are not supported by credible evidence, and after thorough review of the record, we are left with a firm conviction that those findings are mistaken.

Other than as mentioned above, there is nothing inconsistent with the majority's recitation of the facts and the findings of fact entered by the District Court.

On the other hand, the District Court's critical finding to the effect that "defendant had no involvement [during] the period of time when the victim was finally beaten and killed by Lester Kills On Top," is completely consistent with the evidence and the majority opinion, and in fact, is a critical basis for this Court's conclusion.

In response to the dissent's contention that the majority's recitation of facts is inconsistent with this Court's recitation of facts in its previous decision, it is sufficient to note, as pointed out previously, that several statements from the previous opinion were not supported by the record.

*The question we must decide is not whether Vernon Kills On Top can, under these circumstances, be convicted of aggravated kidnapping and deliberate homicide and severely punished, including imprisonment for life. The question is whether under these circumstances the imposition of a death sentence is disproportionate to the degree of Vernon's culpability*

In his petition for postconviction relief, Vernon contends that imposition of the death penalty in his case violates both the requirement of individualized punishment and the proportionality requirement. Both requirements are mandated by the United States Constitution; in addition, proportionality is compelled by the Montana Legislature.

The proportionality requirement and the necessity of individualized punishment are derived from the Eighth Amendment, and are sometimes difficult to distinguish. Justice O'Connor explained the inter-relationship of the two principles in *Enmund v. Florida* (1982), *458* U.S. 782

> [*Coker v.* Georgia (1977), 433 U.S. 5841 teaches . that proportionality--at least as regards capital punishment--not only requires an inquiry into contemporary standards as expressed by legislators and jurors, but also involves the notion that the magnitude of the punishment imposed must be related to the degree of the harm inflicted on the victim, as well as to the degree of the defendant's blameworthiness. Moreover, because they turn on considerations unique to each defendant's case, these latter factors underlying the concept of proportionality are reflected in this Court's conclusion in *Lockett v. Ohio*, *438* U.S. 586, 605 (1978), that "individualized consideration [is] a constitutional requirement in imposing the death sentence" (opinion of Berger, C.J.) (footnote omitted). See *id* at 613 (opinion of Blackmun, J.) ("the Ohio judgment in this case improperly provided the death sentence for a defendant who only aided and abetted a murder, without permitting any consideration by the sentencing authority of the extent of her involvement, or the degree of her *mens rea*, in the commission of the homicide").
>
> In sum, in considering the petitioner's challenge, the Court should decide not only whether the petitioner's sentence of death offends contemporary standards as reflected in the responses of legislatures and juries, but also whether it is disproportionate to the harm that the petitioner caused and to the petitioner's involvement in the crime, as well as whether the procedures under

> which the petitioner was sentenced satisfied the
> constitutional requirement of individualized
> consideration set forth in *Lockett*.

*Enmund*, 458 U.S. at 815-16 (O'Connor, J., dissenting) (emphasis added).

Although the Eighth Amendment of the U.S. Constitution contains no explicit prohibition against disproportionate sentences and no express mandate for individualized punishment,[3] the Supreme Court has held that the cruel and unusual punishment clause of that Amendment bans sentences that are grossly disproportionate to the crime for which the defendant is convicted. *See, e.g., Solem v. Helm* (1983), 463 U.S. 277. In addition, in *Woodson v. North Carolina* (1976), 428 U.S. 280 (followed in *Lockett v. Ohio* (1978), *438 U.S. 586*, 603-04), the Court set forth the requirements of individualized sentencing and specifically stated that:

> [W]e believe that in capital cases the fundamental
> respect for humanity underlying the Eighth Amendment
> requires consideration of the character and record of the
> individual offender and the circumstances of the
> particular offense as a constitutionally indispensable
> part of the process of inflicting the penalty of death.

*Woodson*, 428 U.S. at 304 (citation omitted). In *Solem*, 463 U.S. at 290, Justice Powell noted that, as a matter of principal, "a criminal sentence must be proportionate to the crime for which the defendant has been convicted," and that "no penalty is *per se* constitutional." In addition, in the seminal proportionality case

---

[3]The Eighth Amendment of the federal Constitution, applicable to the individual states through the Fourteenth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

of *Enmund v. Florida* (1981), 458 U.S. 782, 797-98, the United States Supreme Court recognized that the death penalty is unique in its severity and irrevocability, and required that the State must focus on the defendant's personal intent, character, and culpability, and not merely the defendant's role as an accomplice, before the death penalty may be constitutionally imposed.

The Montana Constitution contains a provision virtually identical to its federal counterpart. Article II, Section 22, of the Montana Constitution, specifically provides that: "Excessive bail shall not be required, or excessive fines imposed, or cruel and unusual punishments inflicted." Although that constitutional provision has not yet been applied in the proportionality context, proportionality review is specifically mandated by statute in Montana. As previously noted, § 46-18-310, MCA, while making no mention of a similar responsibility at the district court, requires the state Supreme Court to review the proportionality of each death sentence.

We now hold that pursuant to Article II, Section 22, of the Montana Constitution, the imposition of a death sentence by state courts in Montana must be reviewed for compliance with the proportionality and individualized treatment requirements set forth in *Enmund*.

Therefore, pursuant to the mandates of both the federal and state constitutions and the Montana Legislature, this Court must undertake a review of the proportionality of Vernon's sentence. We have divided our discussion of proportionality into Federal

41

Proportionality Review and Montana Proportionality Review. We note at the outset that Vernon's sentence was reviewed on direct appeal pursuant to only the Eighth Amendment, and that a discussion of Montana's parallel prohibition against cruel and unusual punishment was never undertaken by this Court. *See Vernon Kills On Top I* (1990), *243* Mont. 56, 104-09, 793 P.2d 1273, 1306-09.

Based on an extremely narrow and unfounded application of § 46-21-105(2), MCA, the dissent contends that because independent state grounds for proportionality were not argued on the previous appeal, consideration of our state constitution is precluded in this case. However, § 46-21-105(2), MCA, simply precludes considering "grounds for relief" that could have been, but were not raised by direct appeal. In this case, the "ground for relief" is that the sentence imposed on Vernon Kills On Top was disproportionate to the conduct for which he was convicted. The fact that that conclusion is based on one authority, as opposed to another, does not change the "grounds for relief" anymore than if the conclusion was based on a citation from <u>American Jurisprudence Second,</u> rather than <u>**Corpus** Juris Secundum.</u>

The issue of proportionality and individualized treatment has not been raised for the first **time** in this proceeding. It was raised on appeal.

To first of all conclude that a procedural bar is more important than a human life, and then unreasonably and without authority construe the procedural bar more narrowly than it was *ever* intended in order to preclude consideration of an issue of

such great importance, is not an approach supported by prior case law of this Court, nor commonly accepted notions of justice. The only principle applicable to this Court's reconsideration of the proportionality issue is the principle of *res judicata*, which has already been discussed.

FEDERAL PROPORTIONALITY REVIEW

*Enmund v. Florida* ( 1982 ), 458 U.S. 782, and *Tison v. Arizona* (1987), *481* U.S. 137, mark the starting point for federal proportionality review in the context of accomplice liability. In *Enmund,* the defendant drove a getaway car and his two colleagues killed two intended robbery victims. The Florida court sentenced the defendant to death for his conviction of murder, based on felony-murder and accomplice-liability theories. *Enmund,* 4 58 u S at 786. The United States Supreme Court held that death is a disproportionate penalty "for one who neither took life, attempted to take life, nor intended to take life." *Enmund,* 458 U.S. at 787, 801. The Court applied federal proportionality principles found in *Lockett,* 438 U.S. 586, and *Woodson, 428* U.S. 280, and focused its inquiry on Enmund's personal culpability. The Court concluded that:

> Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims]. This was impermissible under the Eighth Amendment.

*Enmund,* 458 U.S at 798.

43

In 1987, the Court decided *Tison*, *481* U.S. 137. *Tison* did not overrule *Enmund;* however, it arguably restricted its scope. Although the Tison brothers, like Enmund, did not kill or attempt to kill, their case was unlike Enmund's case in that their participation in the **crime** was judged "major" and their **mental** state "highly culpable/--one that was characterized as showing "reckless indifference to human life." *Tison*, *481* U.S. at 157-58.

The *Tison* defendants were brothers who had helped arrange the escape from prison of their father and his **cell mate,** both convicted murderers. Their getaway car broke down and the group decided to steal another car **from** a passing motorist. A **family** stopped to help the group and the group forced them off the highway and down a dirt road. 'The defendants' father told his sons to return to the car for some water and when they returned the defendants witnessed their father and his cell mate shotgun the family to death. The defendants were tried, convicted, and sentenced to death under Arizona's felony-murder and accomplice liability statutes. *Tison*, *481* U.S. at 139-42.

On appeal, the defendants argued that their death sentences were disproportionate, and therefore, in violation of the Eighth Amendment, as construed in *Enmund.* The Supreme Court disagreed and found that *Enmund* **left** open "the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to the value of human life." *Tison*, *481* U.S. at 152. The Court addressed the defendants' contention that they

did not, in *Enmund's* terms, "kill, attempt to kill, or intend to kill," when it stated:

> A narrow focus on the question of whether or not a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all-those who act in self-defense or with other justification or excuse. . . On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all--the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.'
> [W]e hold that the reckless disregard for human iiie implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Tison,* 481 U.S. at 157-58

Therefore, because the Tisons' participation in the underlying crime was deemed "substantial," in that each was "actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder," and because actual armed escape and kidnapping involved a "reckless indifference to human life," the Court held that the Tisons' conduct did not fall within the confines of *Enmund*.

*Tison,* 481 U.S. at 158.

On the basis of *Enmund* and *Tison,*

> [i]t is now clear, as a matter of federal proportionality principles, that capital punishment may be imposed on one who commits a homicide without the purpose or knowledge

45

that death will result, at least to the extent that the defendant's conduct can be characterized as "recklessly indifferent to human life."

*State v. Gerald* (N.J. 1988), 549 A.2d 792, 810. However, this approach has been criticized by both courts and scholars. As one author stated:

> [T]he . . lack of an identifiable core inherent in the *Tison* rule renders it incapable of carrying out any constitutionally meaningful delineation between classes of felony murder accomplices because every felony murder accomplice arguably is recklessly indifferent.
>
> .
>
> . Simply because a court can say that a defendant was recklessly indifferent does not mean that a death penalty is not grossly disproportionate under the eighth amendment. Only by considering all of the factors in a case can a court make this decision.

Richard A. Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death, 31 B.C. L. Rev. 1103, 1163, 1167 (1990).

Another criticized *Tison* for its failure to distinguish between those felons who should be sentenced to death from those who should not:

> By failing to define the terms of its new standard, such as "major participation" or "reckless indifference for human life," the *Tison* Court did not clearly differentiate those felony murderers who should not receive the death penalty from those who should. Thus, by manipulating the facts, or the terms of the new standard, lower courts are free to impose the death penalty on all felony murderers unless the court is presented with a fact pattern identical to that in the *Enmund* decision.

She continues:

> The *Tison* Court's imposition of the death penalty with only superficial regard to the defendant's "blameworthiness" has effectively allowed courts to disregard the defendant's state of mind or level of

culpability in their evaluation of death sentences. Many courts have simply inferred the "reckless indifference to human life," required by *Tison* from a defendant's "major participation" in a felony, and have found the *Tison* standards are thus satisfied. By disregarding the teachings of *Furman*, Gregg, and *Coker* on how punishment must be proportionate to the crime, courts are imposing the death penalty arbitrarily and without regard to individual culpability, a result which would appear to overreach the Court's intent in *Tison* and violate the eighth amendment prohibition against cruel and unusual punishment.

Note, <u>Constitutionalizing the Death Penalty for Accomplices to Felony Murder,</u> 26 Am. Crim. L. Rev. 463, 482, 489-490.

This concern is echoed by others who criticize *Tison* for its new standards. For example, one author deplores the Court's use of the term "recklessness":

> Not only is the Court's new language likely to lead to disparate applications among the states, but the standard also is inconsistent with the major principle of *Furman* and recognized in *Enmund.* Inherent in *Enmund*'s requirement of an individualized consideration of culpability is the idea that the death penalty, typically a punishment reserved for first-degree murder, should not be inflicted on one whose level of culpability is not equivalent to that of other death penalty recipients. Thus, *Enmund* prohibited using the element of participation in the felony to supply the intent requirement for first-degree murder at the sentencing stage.

> The *Tison* Court further confuses the issue by collapsing the element of a high level of participation in the underlying felony into the reckless indifference element . . Collapsing the issues in this way endangers the individualizedconsiderationof culpability required in death penalty cases .

Note, <u>Overstepping Precedent?</u> *Tison v. Arizona* Imposes the Death <u>Penalty on Felony Murder Accomplices,</u> 66 N.C. L. Rev. 817, 835-36.

In addition, some scholars criticize the *Tison* Court for its failure to address the two acceptable goals of capital punishment--deterrence and retribution:

> If neither [deterrence nor retribution] is realized then the penalty is "nothing more than the purposeless and needless imposition of pain and suffering." Without intent to kill, which is commonly considered to establish the highest degree of culpability, it is questionable that the death penalty, the most extreme form of retribution, is proportionate. As for deterrence, the *Enmund* Court made clear that only those who premeditate and deliberate can be deterred. The Court stated "if a person does not intend that life will be taken, or that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus that precedes the decision to act.'"

Note, Overstepping Precedent?, 66 N.C. L. Rev. at 833 (footnotes omitted).

Other scholars have lamented the application of the death penalty to the "nontriggerman" accomplice. As Richard Garnett stated:

> [T]he nontriggerman convicted of felony murder is *three times removed* from the locus of blame: the killing is murder by reason of the felony murder rule, the defendant is responsible for the killing under accomplice liability principles, and he faces the executioner because of the manner in which another person killed. Such a defendant may be at the outer reaches of personal culpability, yet still face death.

Richard W. Garnett, Depravity Thrice Removed: Using the "Heinous, Cruel, or Depraved" Factor to Aggravate Convictions of Nontriggermen Accomplices in Capital Cases, 103 Yale L. J. 2471, 2473 (1994)

Courts, too, have criticized the state of federal proportionality review in the post-*Tison* era. As the New Jersey Supreme Court noted in *Gerald*:

> The failure to distinguish, for purpose of punishment, those who intend the death of their victim from those who do not does violence to the basic principle stated [in *Tison*] that "the more purposeful the conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." *Tison*, 481 U.S. at 156.[4]

*Gerald*, 549 A.2d at 815.

In *Vernon Kills On Top I*, we cited *Tison* for the proposition that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement," and concluded that "the fact that [Vernon] did not deliver the final fatal blows does not preclude imposition of the death penalty." *Vernon Kills On Top I*, 243 Mont. at 106, 793 P.2d at 1307. This Court then considered (despite Vernon's failure to argue the issue) the statutory requirement that the sentence not be excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendants. The Court's brief discussion on proportionality included a list of the cases to which it had compared Vernon's sentence. *Vernon Kills On Top I*, 243 Mont. at 108, 793 P.2d at 1308.

---

[4]The court also noted that: "The failure to make that distinction also creates gross disproportionality in light of the penalties imposed on conviction for such crimes as aggravated assault, aggravated manslaughter, and felony-murder. As such, the infliction of capital punishment on one who does not intend his or her victim's death is a violation of our state constitutional prohibition against cruel and unusual punishment." *Gerald*, 549 A.2d at 815-16 (citations omitted).

49

These included: *State v. Lester Kills on Top* (1990), *243* Mont. 378, 787 P.2d 336; *State v. Dawson* (1988), *233* Mont. 345, 761 P.2d 352; *State v. Keefe* (1988), 232 Mont. 258, 759 P.2d 128; *State v. Smith* (1985), 217 Mont. 461, 705 P.2d 1087; *State v. Fitzpatrick* (1980), 186 Mont. 187, 606 P.2d 1343; *State v. Coleman* (1979), 185 Mont. 299, 605 P.2d 1000; *State v. McKenzie* (1976), 171 Mont. 278, 557 P.2d 1023. The court noted that each of the cases, except *Keefe*, involved a death penalty imposed for the aggravated kidnapping and subsequent death of a victim. *Vernon Kills On Top I*, 243 Mont. at 109, 793 P.2d at 1308. This Court concluded that Vernon was a major participant in the crimes committed, and that he exhibited a reckless disregard for human life. *Vernon Kills On Top* I, 243 Mont. at 109, 793 P.2d at 1309.

Our prior review, however, was flawed based on even the *Tison* standard. First, the cases the Court "compared" are markedly dissimilar to Vernon's case because, while Vernon was not present at the actual murder and arguably displayed no intent to kill the victim, the defendant in each of the "comparable" cases was the principle actor (and not the "nontriggerman") in the actual killing.' In addition, Vernon's sentence was not compared to that

---

'This Court has only considered ten death penalty convictions since 1973. Since *Vernon Kills On Top* I, we have decided *Slate v. Turner* (1993), 262 Mont. 39, 864 P.2d 235, *State v. Gollehon* (1993), 262 Mont. 1, 864 P.2d 249, and *State v. Langford* (1991), 248 Mont. 420, 813 P.2d 936. None of these cases is "comparable" to Vernon's. Any proportionality review of Vernon's sentence must take into account the facts that Vernon was not present at the murder and arguably did not intend the murder; therefore a proportionality review which uses only these ten Montana cases is fatally flawed. In addition, in the later case of *Turner*, 262 Mont. at 60, 864 P.2d at 248, this

of Diane Bull Coming, who, based on everyone's testimony, including her own, was more directly involved in Etchemendy's death than Vernon.

Second, Vernon's case presents a situation more similar to the facts of *Enmund* than the facts of *Tison.* The defendants in *Tison* provided firearms to convicted murderers to aid their escape from prison and were admittedly willing to kill, if necessary, in furtherance of that escape. In addition, the *Tison* court attached significance to the fact that the defendants were physically present when the murders were committed. Justice O'Connor, speaking for the majority, emphasized:

> Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnapping-robbery <u>and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight</u>.

*Tison*, 481 U.S. at 158 (emphasis added).

For these reasons we reverse our prior conclusion that based on a review for proportionality pursuant to the Eighth Amendment to the U.S. Constitution, the State proved sufficient culpability on the part of Vernon for the death of John Martin Etchemendy, Jr., to justify imposition of a death sentence. However, because we

---

Court performed a proportionality review for Turner, who was the principle actor in a deliberate homicide. This Court found that "Turner's conduct was <u>significantly more culpable than that of Vern Kills On Top</u>." *Turner*, 262 Mont. at 60, 864 P.2d at 248 (emphasis added). The Court's opinion points out that Vernon was not present at the time of the killing. On the basis of *Turner*, it is arguable that if Vernon is indeed less culpable, his sentence should proportionally reflect his less purposeful conduct.

conclude that *Tison* does not provide sufficient guidance for future determination of who can and who cannot be constitutionally sentenced to death under Montana's Constitution, we choose to afford clearer protection consistent with the standard in *Enmund* under Montana's Constitution, and therefore, the following discussion is necessary.

STATE PROPORTIONALITY REVIEW

Article II, Section 22, of the Montana Constitution, provides that cruel and unusual punishment shall not be inflicted. Montana may interpret this section more strictly than the United States Supreme Court interprets the federal equivalent because "[s]tates are free to grant citizens greater protections based on state constitutional provisions than the United States Supreme Court divines from the United States Constitution." *State v. Bullock (1995)*, 272 Mont. 361, 383, 901 P.2d 61, 75. As we stated in *Bullock:* "We have chosen not to 'march lock-step' with the United States Supreme Court, even when applying nearly identical language." *Bullock,* 2 72 Mont. at 384, 901 P.2d at 75.

The U.S. Supreme Court has recognized the importance of the state court's role in death sentence review. In *Cabana v. Bullock* (1986), 474 U.S. 376, the U.S. Supreme Court remanded a case to the state court system to make factual findings consistent with the Eighth Amendment as mandated by *Enmund*. According to the Court:

> [I]t is the [state court], therefore, not the federal habeas corpus court, which should first provide [the defendant] with that which he has not yet had and to which he is constitutionally entitled--a reliable

52

> determination as to whether he is subject to the death
> p e n a l t y

*Cabana,* 474 U.S. at 391.

The Court further noted that "[c]onsiderations of federalism and comity counsel respect for the ability of state courts to carry out their role as the primary protectors of the rights of criminal defendants." *Cabana,* 474 U.S. at 391 (citing Younger *v. Harris* (1971), *401 U.S. 37).* The Supreme Court has also observed that in capital cases, as in other constitutional contexts, the states "are free to provide greater protections in their criminal justice system than the Federal Constitution requires." *California v. Ramos* (1983), *463* U.S. 992, 1013-14.

It is therefore appropriate to analyze the death penalty pursuant to not only the federal constitution, but our state constitutional standards as well. This approach was undertaken by the New Jersey Supreme Court in *Gerald,* 549 A.2d 792. In Gerald, the issue before the court was "whether a sentence of death is disproportionate for a defendant who had no intent to kill his or her victim, but rather intended only to inflict serious bodily injury, even though the injury did in fact result in death." *Gerald,* *549* A.2d at 811. The court first worked through the federal proportionality analysis and determined that: "Defendant's conduct in this case appears (or so a jury could find) to fall within the *Tison* category of nonintentional murders that manifest a reckless indifference to human life." *Gerald, 549* A.2d at 810. However, the court held that:

<u>The federal constitutional analysis, of course, does not end the</u> inquiry

> . . Resort to a state-constitutional analysis is especially appropriate in light of the fact that "capital punishment is a matter of particular state interest or local concern and does not require a uniform national policy."

Gerald, 549 A.2d at 810-11 (citation omitted). The *Gerald* Court did look to the Supreme Court for guidance where it deemed the Court's language persuasive:

> We **sometimes** look to aspects of the Supreme Court's constitutional analysis, where persuasive, for guidance in establishing principles under our state constitution. We observe at the outset that the death penalty statute **must** "limit imposition of the penalty to what is assumed to be the small group for which it is appropriate." (Citing *Furman v. Georgia*, 408 U.S. at 310 (White, J., concurring).) We also record our agreement with the *Tison* Court's statement that "[d]eeply ingrained in our legal tradition is the idea that the more purposeful the conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." *Tison, 481 U.S. at 156.*

*Gerald,* 549 A.2d at 811 (citation omitted).

Although we agree with the U.S. Supreme Court's holding and rationale in *Enmund* and the language from *Tison* cited by the New Jersey Court in *Gerald,* we do not believe that wholesale application of *Tison* to the Montana Constitution would sufficiently distinguish between various forms of conduct for purposes of imposing the death penalty. Montana's statute which requires proportionality review strengthens our conclusion, as does the U.S. Supreme Court's apparent inclination to further erode its holding in *Enmund.* As one source stated:

> Though *[Pulley v. Harris*[6] (1984), 465 U.S. 371 arguably departs from the Court's previous ringing endorsement of proportionality review as a constitutional requirement, it does not contradict the language in [Gregg *v.* Georgia (1976), 428 U.S. 153] indicating that proportionality review is important because it can help eliminate "wanton" and "freakish" death sentences. <u>In addition, *Pulley* is not particularly important in states that, by providing statutorilymandatedproportionality review, go beyond what the United States Constitution requires.</u>

Comment, <u>A Critical Evaluation of State Supreme Court Proportionality Review in Death Sentence Cases,</u> 73 Iowa L. Rev. 719, 725 (emphasis added).

Tennessee is another state with a statutory requirement of proportionality review. In 1992 the Tennessee Supreme Court addressed the issue of the proportionality of the death penalty to the crime of felony murder. *State v. Middlebrooks* (Tenn . 19 92 ) , 84 0 S.W.2d 317, 335-47. Like the *Gerald* court, the Tennessee Supreme Court first applied "the minimum standards for determining whether a sentence of death may be constitutionally imposed under the United States Constitution for felony murder" by applying the *Enmund/Tison* analysis. *Middlebrooks*, 840 S.W.2d at 337. The Court continued, however:

> These federal standards do not, however, answer the question under the state constitution . [W]e may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantee, but may impose higher standards and stronger protections than those set by the federal constitution.

---

[6]*Pulley* held that the Eighth Amendment does not invariably require state appellate courts, before confirming a death penalty in any case, to compare the case before it with the penalties imposed in similar cases if requested to do so by the prisoner. *Pulley,* 465 U.S. at 876.

*Middlebrooks*, 840 S.W.2d at 338. The Court ultimately relied on its own statutory provision to determine that its state constitution required stronger protections for felony murderers:

> An integral part of the death penalty statute that must be construed in pari materia is the automatic review of every death sentence by this Court. Subsection (c) of that statute enumerates our duties that include eliminating any arbitrary, excessive, or disproportionate imposition of the death penalty. .

> Accordingly, rather than an absolute rule of *per se* disproportionality, this Court has in the past relied on its statutory duty of review under [Tennessee statute] to assure that the sentence *in each case* is not disproportionate or excessive. We agree with that approach and with Justice Blackmun's rejection of the *per se* proportionality approach in his dissent in *Lockett v. Ohio*, *438* U.S. 586, 613-619. He observed in that connection that a sentence in felony murder should be based on evidence of a particular defendant's participation in homicide and his mens rea in regard to the homicidal act.

> We, therefore, reaffirm the rejection of a *per se* proportionality approach in favor of the required statutory proportionality review.

*Middlebrooks*, 840 S.W.2d at 339-40.

Like the Tennessee court, we do not today adopt a rule that the death sentence can never be imposed on someone convicted of felony murder. What we do hold is that, pursuant to statute and the Montana Constitution, each case has to be reviewed on the basis of its unique facts to assure that the death sentence is not disproportionate to the degree of that defendant's culpability for a victim's death.

We reject wholesale adoption of the Supreme Court's language in *Tison* because we agree that it lacks any "identifiable core" which provides us with a meaningful way of delineating under our

56

own constitution between those felony murder participants who possess sufficient culpability to warrant imposition of the death penalty and those who lack any intent whatsoever to cause the death of another. We conclude that a finding of mere "reckless indifference" is not sufficient for imposition of the death penalty under the proportionality review required pursuant to the Montana Constitution, and that the "reckless indifference" standard allows courts to provide only superficial regard to a defendant's "blameworthiness" before imposing a punishment, which, if imposed without regard to blameworthiness, would be cruel and unusual. Furthermore, we conclude that imposition of the death penalty without a requirement that there have been some intent to kill on the part of the defendant would serve no purpose of deterrence. If a person has no intent to kill from the beginning, then the fact that he might suffer the imposition of a death penalty cannot "enter into the cold calculus that precedes the decision to act." *Enmund*, 458 U.S. at 799 (quoting *Gregg*, 428 U.S. at 186). Although the deterrent purpose of the death penalty is not its only purpose (*see Enmund* and *Tison*), it is one factor to consider in the course of our individualized review for proportionality.

After thorough review of the record in this case, we conclude, on independent state constitutional grounds, that because Vernon Kills On Top was not present when John Etchemendy was killed, did not inflict the injuries which caused his death, and because there was no reliable evidence that he intended his death--but instead evidence that he sought to avoid it--the imposition of his death

sentence was disproportionate to his actual conduct, cannot withstand individualized scrutiny, and must be set aside. To the extent that State *v. Vernon Kills On Top* (1990), *243* Mont. 56, 793 P.2d *1273*, is inconsistent with this opinion, it is reversed.

Nothing in this opinion precludes the imposition of any other penalty provided by law for the crimes of which Vernon was convicted (should his conviction survive further challenge), including life in prison as provided for in §§ 45-5-102(2) and *-303*(2), MCA.

ISSUE 5

Did the District Court err when it denied five of the petitioner's **claims** based on the procedural bar found at § 46-21-105, M C A, because they were not previously raised on appeal?

Vernon Kills On Top contends that the District Court erred when it dismissed his claims numbered 3, 6, 7, 8, and 12 based on the procedural bar found at § 46-21-105, MCA. Subparagraph (2) of that section provides as follows:

> (2) When a petitioner has been afforded a direct appeal of the petitioner's conviction, grounds for relief that could reasonably have been raised on direct appeal may not be raised in the original or amended petition.

In *Lester Kills On Top v. State* (1995), 273 Mont. 32, 60, 901 P.2d 1368, 1386, we cited with approval our recent observation in *In re Manula* (1993), 263 Mont. 166, 169, 866 P.2d 1127, 1129. There we stated that:

> We have applied that statutory bar [in § 46-21-105(2), MCA] consistently in order to prevent the abuse of postconviction relief by criminal defendants who would

substitute those proceedings for direct appeal and in order to preserve the integrity of the trial and direct appeal.

In *Lester Kills On Top*, 273 Mont. at 60, 901 P.2d at 1386, we also overruled that part of *State v. Henricks* (1983), 206 Mont. 469, 474, 672 P.2d 20, 23, which suggested that the procedural bar would not be applied, and held that we would apply § 46-21-105(2), MCA, based on its plain **terms.**

In accord with the statutory requirement and our prior decision in *Lester Kills On Top*, we conclude that claims 3 and 6 could reasonably have been raised during Vernon's direct appeal to this Court, but were not. Our refusal to consider those issues now will not result in a fundamental miscarriage of justice, and therefore Vernon is procedurally barred from raising them in this petition for postconviction relief. We also observe that **claims** 7, 8, and 12 relate to the District Court's imposition of the death sentence. That sentence has now been vacated. We conclude, therefore, that those issues are moot.

For these reasons, the District Court's summary dismissal of claims numbered 3 and 6 is affirmed and we decline to address the District Court's summary dismissal of **claims** numbered 7, 8, and 12.

In summary, the District court's dismissal of Vernon Kills On Top's petition for postconviction relief based on ineffective assistance of counsel is vacated and this case is remanded to the District Court for a hearing at which the petitioner is entitled to present evidence of ineffective assistance limited to the issues previously set forth in this

opinion. Furthermore, the imposition of the death sentence as a penalty in this case is vacated and, in the event that Vernon Kills On Top's conviction is affirmed, following the hearing to consider his claim that he received ineffective assistance of counsel, the death penalty is not a sentencing option for the District Court. He may otherwise be sentenced for the crimes of which he was convicted consistent with all remaining options set forth in Montana's Criminal Code, including life in prison.

_____
Justice

We concur:


_____
Chief Justice


_____

_____
Justices

District Court Judge John R. Christensen

**60**

Justice Karla M. Gray, concurring and dissenting.

I concur in the Court's opinion on issues two and five and in parts of that opinion on issues one and three. I respectfully dissent from portions of the Court's opinion on issues one and three and from the entirety of that opinion on issue four.

Issue one is whether the District Court erred in denying petitioner the opportunity to amend his petition for postconviction relief. With regard to the proposed amendments relating to ineffective assistance of counsel, newly discovered evidence, <u>Bradv</u> violations and cumulative denial of due process, I agree with the Court that the amendments were not futile and that the District Court abused its discretion in determining otherwise.

I disagree with the Court's determination that the proposed amendment to claim 11 to refer to § 45-2-302(1), MCA, should have been allowed. First of all, it is undisputed that petitioner was not charged under this particular subsection of the "legal accountability" statute which requires that the mental state necessary for the underlying offense must be "shared" by the person the State seeks to hold legally accountable for the acts. Subsection (3) of § 45-2-302, MCA, which is applicable in this case, requires only that

> either before or during the commission of an offense with the purpose to promote or aid such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense.

Moreover, this § 45-2-302(1), MCA, issue--which by the Court's own

61

characterization relates to the existence or lack thereof of a statutory aggravating circumstance and not to proportionality-- could have been raised in petitioner's direct appeal and was not. On that basis, the issue is procedurally barred under § 46-21- 105(2), MCA, and <u>Lester Kills on Tou</u>, 901 P.2d at 1386-87. For these reasons, it is my view that the District Court did not abuse its discretion in rejecting the proposed amendment to claim 11 on the basis that it was futile. The remainder of my disagreement with the Court over this particular proposed amendment relates to my strenuous disagreement regarding issue four, the proportionality issue, which is discussed below.

With regard to issue one, I also am concerned with the Court's sweeping suggestion that any and all motions to amend a petition for postconviction relief--at least in a death penalty case--must be granted. It is my view that neither the law nor "justice" supports such a theory.

Nor do I see the relevance of the Court's observation that "no prejudice to the State was established which would justify" denial of petitioner's motion to amend his petition for postconviction relief. The Court cites to no authority under which the State must establish prejudice regarding a proposed amendment prior to such time as the proposing party establishes that justice requires that the motion be granted, and I know of none.

My final observation with regard to the Court's discussion of issue one relates to the 1995 amendments to § 46-21-105, MCA, which are not applicable to the case presently before us. As amended, §

46-21-105(1), MCA, expressly provides that a petition for postconviction relief "may be amended only once." Presumably the Court will apply that limitation, pursuant to the clear intent of the legislature, in future postconviction proceedings to which it applies, absent a successful constitutional challenge. I fear, however, that the Court's sweeping suggestion in this case--that any and all motions to amend a petition for postconviction relief in a death penalty case must be granted--will prove a significant stumbling block to anyone attempting to argue that this Court must follow the law duly enacted by the legislature in § 46-21-105(1), MCA (1995).

Issue three is whether the District Court erred in concluding that certain of the petitioner's claims were barred by the doctrine of res iudicata. The Court holds that, except as to the claims which raise proportionality arguments pursuant to the United States and Montana Constitutions, the District Court did not err in concluding that certain of petitioner's claims are so barred. I agree with the Court that the specified claims are barred by res iudicata.

With specific regard to the proportionality claims, I agree with the Court that the doctrine of res iudicata was not enacted into the postconviction relief statutes by the Montana legislature and, therefore, that the doctrine is a judicial creation. I also agree that we have recognized an exception to its applicability where the case already must be remanded for further proceedings because of reversal on an unrelated issue. See Zimmerman, 573 P.2d

63

at 178. This threshold <u>Zimmerman</u> procedural circumstance is present in this case because we have concluded that the <u>Brady</u> violations require that petitioner be resentenced, for the reasons discussed in some detail in petitioner's brother's recent postconviction case. <u>See</u> <u>Lester Kills on Top</u>, 901 P.2d at 1375-77.

However, <u>Zimmerman</u> authorizes us to revisit an issue resolved on direct appeal only "to correct a manifest error in [our] former opinion." <u>Zimmerman,</u> 573 P.2d at 178. Based on <u>Zimmerman,</u> the Court refuses to bar petitioner's proportionality arguments under either the federal or the Montana Constitution and proceeds, in issue four, to address those arguments on the merits under both Constitutions. I disagree that <u>Zimmerman</u> authorizes us to address proportionality under either Constitution.

With regard to the issue of proportionality under the United States Constitution which we addressed and resolved in petitioner's direct appeal, it is my view that our earlier opinion did not contain manifest error and that the Court's proportionality analysis in the present case is flawed. Therefore, I would apply the <u>res iudicata</u> bar to petitioner's proportionality argument under the United States Constitution.

Before even beginning its proportionality analyses, the Court "reviews" the evidence which led to petitioner's conviction for aggravated kidnapping and deliberate homicide and to the imposition by the sentencing court of the death penalty. Its review rather pointedly minimizes the evidence about the extent of petitioner's participation in the episode which resulted in Etchemendy's death.

64

Instead, it focuses largely on the testimony of Diane Bull Coming and, in the guise of "reviewing" that testimony, reweighs her testimony and redetermines her credibility. The Court cites to no authority under which it is authorized to do so, and I submit that the sole intent of this "review" is to buttress the conclusion the Court determined in advance to reach. In my opinion, we are bound on these factual matters by the record which supported the jury verdicts and the findings of fact made by the sentencing court and which we reviewed and affirmed on appeal in State v. Kills On Top (1990), 243 Mont. 56, 793 P.2d 1273.

That record indicates that the deliberate homicide was committed by means of torture and that the aggravated kidnapping resulted in the death of the **victim** that petitioner was "directly involved in the serious beating of the victim;" that this severe physical brutality engaged in by petitioner was so severe it could have caused death even absent further infliction of physical violence by petitioner's brother; that after that potentially fatal beating, petitioner participated in placing the nude victim in the trunk of the vehicle and did nothing for him in the subsequent twelve-hour period; and that later, on two occasions, petitioner agreed that the victim had to die. Kills on Top), 793 P.2d at 1300-1308. Indeed, we specifically determined that the sentencing court's finding that petitioner "agreed that the victim had to die" was supported by the record. Kills on Top, 793 P.2d at 1308. Notwithstanding this record, and our related determinations in petitioner's direct appeal, the Court resorts to "retrying" these

65

matters here.  I cannot join in such a course of action.

The Court then proceeds to its "Federal Proportionality Review."  It sets forth, briefly, the United States Supreme Court's controlling Enmund and Tison cases, and then presents lengthy criticisms of Tison from law review articles and one court.  There appears to be no reason for including this segment, other than the Court's implicit agreement with the criticisms of Tison advanced by others.  The question before us here, however, is not whether we agree with the Supreme Court's decision in Tison; the issue here is whether this Court erred in applying that decision in petitioner's direct appeal.  Thus, the "criticism" is totally irrelevant to the Court's purported federal proportionality review in this case.

The Court does finally advance its analysis regarding whether, under federal proportionality standards set forth in Enmund and Tison, this Court's opinion in petitioner's direct appeal contained "manifest error" for purposes of applying the Zimmerman exception to the doctrine of res iudicata.  In one short paragraph, it concludes that our previous analysis under Tison was flawed.  That paragraph is followed by another single paragraph asserting that petitioner's case "presents a situation more similar to the facts of Enmund than the facts of Tison."  I submit that the Court is incorrect in both regards.  As a result, it is my view that our opinion on this issue in petitioner's direct appeal was not manifestly erroneous and does not support refusing to apply res iudicata here pursuant to Zimmerman.

Regarding Tison, the facts in that case were as follows.  The

66

Tison brothers planned and executed their father's armed escape from the Arizona State Prison. When a tire blew out on their vehicle after the escape, they decided to flag down a passing motorist and steal a car; they armed themselves and waited at the side of the road. When the Lyons family stopped to render assistance, they were forced into the backseat of the Tison vehicle and driven into the desert, where they were ordered out while the Tisons stole their property and put it into the Tison vehicle. Within the view of the Tison brothers, their father and his co-escapee murdered the Lyons family with the shotguns used in the escape. Neither brother made any effort to help the victims. Tison, 481 U.S. at 139-41. The brothers subsequently were convicted of armed robbery, kidnaping, car theft and felony-murder. The sentencing court found three statutory aggravating factors and no statutory mitigating factor; it specifically found that the brothers' participation in the crimes giving rise to the application of the felony-murder rule was "very substantial." Tison, 481 U.S. at 142. On appeal, the Arizona Supreme Court determined that the record established that both brothers were present during the homicides and that the homicides "occurred as part of and in the course of the escape and continuous attempt to prevent recapture." Tison, 481 U.S. at 143. The brothers subsequently challenged their death sentences in postconviction proceedings, which ultimately reached the United States Supreme Court. Tison, 481 U.S. at 143, 145-46.

The issue before the Supreme Court was whether the Eighth

Amendment permitted imposition of the death penalty for nontriggermen who took no act desired, or substantially certain, to cause death but whose participation in the crimes was major and whose mental state was one of reckless indifference to the value of human life. Tison, 481 U.S. at 152. Distinguishing the facts from Enmund, the Supreme Court determined from the record that the petitioners were "actively involved in every element of the kidnaping-robbery and physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family. . " Tison, 481 U.S. at 158. On that basis, the Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Tison 481 U.S. at 158.

It is clear that the Tison Court premised its holding on the brothers' major participation in the underlying felonies which gave rise to the felony-murder death sentences, and the reckless indifference to human life shown by that participation and their failure to do anything to prevent the murders. We applied these Tison criteria in Kills On Top and held that the facts of this case were sufficient to satisfy the individual culpability requirement set forth in Enmund. Kills on Too, 793 P.2d at 1306-1308. It is clear that we were correct in doing so; indeed, it is my view that petitioner's culpability here is greater than that of the Tison brothers.

Petitioner was driving the vehicle at the inception of the lengthy episode which culminated in Etchemendy's death and, indeed,

drove the group out of town for the purpose of "rolling" and stealing from him; petitioner confiscated Etchemendy's credit cards and employment checks from his wallet. Kills On Top, 793 P.2d at 1280. When petitioner's brother and Etchemendy were fighting in the back seat of the vehicle, petitioner stopped the car because he "wanted in on some of this;" while Etchemendy screamed and pleaded with them to stop, petitioner and his brother continued beating him and kicked him while he was lying on the ground. Petitioner then attempted to choke the victim in the back seat of the car. Kills On Top, 793 P.2d at 1280. Petitioner later told Etchemendy to remove his clothes and helped place the nude victim into the trunk of the car. Kills On Top, 793 P.2d at 1280. Petitioner and his brother subsequently cashed one of Etchemendy's checks and divided the money between them. Later, petitioner agreed with his brother on two occasions that they would have to kill and "get rid of" Etchemendy. Kills On Top, 793 P.2d at 1281. While petitioner was not physically present when Etchemendy was murdered, he did nothing in the lengthy pre-murder stages of the episode to help the victim or prevent the homicide. Indeed, petitioner aided in leaving the area after the murder. Kills On Top, 793 P.2d at 1282. Petitioner did not inflict the final fatal blows, but the record established that the kick in the head which petitioner did inflict on Etchemendy could have caused his death eventually even without further infliction of physical violence. Kills on Top, 793 P.2d at 1308.

A proper application of Tison to these facts and this record

mandates two conclusions: First, petitioner was a major participant in the felony offenses--robbery and kidnaping--committed prior to the actual fatal blows which killed Etchemendy and upon which the State charged him with deliberate homicide by accountability under the so-called felony-murder rule. Second, petitioner's acts demonstrated, at the very least, a reckless indifference to human life. These are precisely the conclusions we reached on this issue in petitioner's direct appeal. They were correct then, and they remain correct today. The Court simply prefers to ignore the facts and the record concerning petitioner's culpability in its determination to find "manifest error" regarding federal proportionality requirements in our earlier decision--all for the purpose of avoiding the res iudicata effect of that decision.

Nor is the Court correct in stating that the present case more closely resembles Enmund than Tison. In Enmund, two persons committed robbery and then shot and killed their victims. Enmund, 458 U.S. at 784. Defendant Enmund was believed by law enforcement to have been waiting in a car outside the premises for the offenders to return and to have driven the "getaway car." Enmund, 458 U.S. at 784. One of the primary offenders was tried with Enmund, and both were convicted of two counts of first-degree murder and one count of robbery; Enmund was sentenced to death for his role as an accomplice in the commission of an armed robbery which resulted in two deaths. Enmund, 458 U.S. at 784-85.

The United States Supreme Court granted Enmund's petition for

certiorari from the Florida Supreme Court's affirmance of the death sentences in order to address the issue of whether death is a valid penalty under the Eighth Amendment for one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Enmund, 458 U.S. at 787, 797. The Supreme Court determined that Enmund "did not kill or attempt to kill; and, as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder." Enmund, 458 U.S. at 798. Indeed, the "'only evidence of the degree of [Enmund's] participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes."' Enmund, 458 U.S. at 786 (emphasis added). On the basis of this record, the Supreme Court reversed the imposition of the death penalty. Enmund, 458 U.S. at 801.

I will not reiterate the record before us in this case regarding petitioner's actual involvement and participation in the extensive criminal episode which culminated in Etchemendy's death. Nor will I present a detailed analysis of the extent to which that participation differed both qualitatively and quantitively from the record before the Supreme Court in Enmund. Suffice it to say that it is my view that the negligible degree of personal culpability present in Enmund bears no resemblance whatsoever to petitioner's personal culpability in this case. The Court is clearly, and simply, wrong in concluding that the present case is more like

71

Enmund than like Tison. It is equally, and as clearly, wrong in using its incorrect analysis as a means by which to conclude that our decision in the direct appeal of petitioner's convictions and sentences was "manifest error" which allows us to revisit the proportionality issue already--and correctly--addressed there.

I also disagree with the Court's decision to address petitioner's proportionality argument under the Montana Constitution. The Court correctly notes that no proportionality issue under the Montana Constitution was raised or addressed in petitioner's direct appeal. Under such a circumstance, the law is clear that we cannot address that claim in this postconviction proceeding.

Section 46-21-105(2), MCA, provides as follows:

> When a petitioner has been afforded a direct appeal of the petitioner's conviction, grounds for relief that could reasonably have been raised on direct appeal may not be raised in the original or amended petition.

In our recent opinion in petitioner's brother's postconviction proceeding, we overruled an earlier case to the extent it stood for the proposition that this Court can review issues in postconviction proceedings which could have been--but were not--raised on direct appeal. See Lester Kills On Top, 901 P.2d at 1386-87. We then applied the statutory procedural bar to each and every postconviction claim which could have been raised on direct appeal. See Lester Kills On Top, 901 P.2d at 1387-90.

We must do the same here with regard to petitioner's proportionality arguments under the Montana Constitution. These matters clearly could have been raised on direct appeal. Since

72

they were not, we are obligated to apply the statutory procedural bar contained in § 46-21-105(2), MCA. The Court does not affirmatively address the statutory bar in any respect regarding the proportionality arguments petitioner raises under the Montana Constitution although, interestingly, it has no difficulty in affirming the District Court's application of that bar to other of petitioner's claims in issue five. While I concur in the Court's opinion on issue five, I cannot agree with its totally inconsistent approach in not applying the § 46-21-105(2), MCA, procedural bar to the proportionality issue raised under the Montana Constitution.

Nor do I agree with the Court's view that the Montana Constitution is not a separate "grounds for relief" which could have been raised on direct appeal for purposes of applying the procedural bar contained in § 46-21-105(2), MCA. I note that we used "grounds for relief" interchangeably with "issues," "claims" and "arguments" in Lester Kills on Top, 901 P.2d at 1385-90. Moreover, it is clear, even from the Court's opinion in this case, that the Montana Constitution is being used as a basis for relief separate and distinct from that available under the United States Constitution.

Moreover, the Court's castigation of the dissent as putting a procedural bar ahead of human life is mere rhetoric which appeals to the emotions but ignores the law. The statutory procedural bar contained in § 46-21-105(2), MCA, was duly enacted by the Montana legislature and it is our clear and simple duty to apply that bar pursuant to its terms. We did so in Lester Kills on Top and we are

73

obligated to do so here. The Court's attitude only fuels the public's perception that courts are unwilling under any circumstances to allow implementation of death sentences and are willing to ignore applicable law in order to impose their views.

Nor does--or can--the Court support its charge that the dissent construes the statutory procedural bar more narrowly than it was ever intended. Section 46-21-105(2), MCA, speaks for itself regarding the legislature's intent. It was intended to do precisely what it should do in this case: preclude a petitioner for postconviction relief who has been afforded a direct appeal from raising thereafter--in the postconviction context--an issue which could have been raised on direct appeal but was not. While this Court may not agree with the legislature's intention, we are obliged to apply it.

It is relatively clear that the Court feels compelled to rely on a proportionality analysis under the Montana Constitution as specifically providing a separate ground for relief in order to avoid review by the United States Supreme Court of the Enmund/Tison rationale it sets forth under the United States Constitution. While I often join my brethren in avoiding such review by relying on "independent state grounds," I cannot do so here where the only means of achieving that end is to breach the consistent application of the statutory procedural bar to which we so recently and strongly committed in Lester Kills on Too.

It is our role--unpopular as it often is with the public--to ensure that the State does not violate the rights of criminal

defendants.    It is not our role to ignore the law in order to provide  those defendants with rights to which they are not entitled,    It is my view that the Court has allowed its determination to limit the availability of the death penalty in Montana to override its obligation to apply the statutory procedural bar  to petitioner's  contention  that  the  Montana Constitution precludes imposition of the death penalty in this case.   I cannot agree.

I dissent

_____
Justice

Chief Justice J. A.  Turnage joins in the foregoing concurring and
dissenting  opinion.

_____
Chief Justice

Justice Terry N. Trieweiler specially concurring.

The dissent touches all the politically-correct buttons. It pays homage to the Legislature and crows about judicial restraint. It accuses the majority of ignoring the law, basing its decision on emotions, and refusing to enforce the death penalty based on the members' own views. The author of the dissent first weaves a procedural bar out of transparent whole cloth, and then wears the procedural bar she has woven as her own mantelet of judicial honor.

The dissent gets high marks for political pandering, but has little basis in law or in fact. The dissent is replete with factual inaccuracies and exaggerations which the author would apparently prefer to perpetuate, rather than recognize the record by which she contends we are bound.

The dissent suggests that this Court first arrived at its conclusions, and then sought to buttress them by its "review" of the facts. Anyone who participated in the extensive arguments, deliberations, and discussions conducted by this Court, and paid even minimal attention, *knows* better. But the statement makes a good sound bite.

The dissent contends that the facts stated in this Court's previous opinion were correct then and are correct now, apparently operating on the assumption that saying so makes it so. The author of the dissent has obviously not personally reviewed the record in this case.

The dissent accuses the majority of failing to affirmatively address the procedural bar to consideration of Montana's

Constitution. The omission is for good reason. Not even the State of Montana has contended that there is a procedural bar to consideration of the proportionality issue pursuant to Montana's own Constitution. The issue was first raised *sua sponte* by the author of the dissent when her first written dissent was circulated. It is difficult to reconcile this type of activism with the same author's refusal to address our constitution in *State v. Zabawa* (Mont. Nov. 21, 1996), No. 95-349, simply because the defendant did not assert that it provided greater protection than the federal constitution. So much for the judicial restraint that the dissent purports to idealize.

The dissent suggests that to ignore a procedural bar (incorrectly assuming that one exists) simply because this case involves the death penalty infers some kind of weak-kneed idealism based on emotion, rather than the law. In doing so, the author of the dissent, herself, ignores repeated declarations by the U.S. Supreme Court and its members to the effect that death penalty cases must be treated differently when the issue of a procedural bar is considered. As pointed out by Justice Stevens in his dissent to *Smith v. Murray* (1986), *477* U.S. 527:

> ("The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *Zant v. Stevens*, *462* U.S. *862*, *884* *(1983)* (" [T]here is a qualitative difference between death and any other permissible form of punishment"); *Rummel v. Estelle*, *445* U.S. *263*, *272* (1980) ("This theme, the unique nature of the death penalty for purposes of Eighth Amendment analysis,

77

has been repeated time and time again in our opinions.
.   [A] sentence of death differs in kind from any
sentence of imprisonment"); *Lockett v. Ohio*, *438* U.S. 586, 605
(1978) (BURGER, C.J.) ("[T]he imposition of death by
public authority is profoundly different from all
other penalties"). Cf. Meltzer, State Court Forfeitures
of Federal Rights, 99 Harv. L. Rev. 1128, 1222 (1986)
("[W]hen a capital defendant raises a nonfrivolous
constitutional question, neither state nor federal courts
should be free to refuse to decide it simply because it
was not raised in accordance with state procedural
requirements. Rather, federal law should expressly
provide that in matters of procedural default, as in
other matters, death is different").

Indeed, the Court has recognized that even the *threat*
of a death penalty may, in certain circumstances, exert
a special pull in favor of the exercise of the federal
court's undisputed statutory power to entertain a habeas
corpus writ on a claim that was procedurally defaulted.

*Smith*, 477 U.S. at 545-46 n. 11 (Stevens, J., dissenting) (emphasis

added).

While the dissent is strong on political rhetoric, its legal

analysis is faulty, its regard for the record is questionable, and

its recognition of the judiciary as an independent branch of

*government* responsible for enforcement of Montana's Constitution is

apparently less important than stoking the flames of public

reaction to a grisly series of events, even if that means

exaggerating this defendant's involvement in those events

It is always a challenge to decide brutal and sensationalized

cases strictly on the law. That responsibility is only made more

difficult by irresponsible and factually inaccurate and exaggerated

statements like those made by the dissent.

If the author of the dissent had as much regard for the

record as she claims, and limited her discussion to those legal

issues over which there is arguably a basis for disagreement, the opinion and the dissent would be shortened considerably, and the public would be better served.

_____
Justice