JUSTICE TRIEWEILER
concurring and dissenting.
¶76 I concur with the majority’s resolutions of Issues 1 through 4.
¶77 I dissent from the majority’s conclusion that there was substantial evidence to support the District Court’s determination that Vernon Kills On Top should be ineligible for parole.
¶78 First of all, it should be noted that eligibility for parole does not guarantee parole. Section 46-23-201(1), MCA (1987), conditions parole on the parole board’s determination that, “there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community....” Furthermore, subparagraph (2) of the same statute provides that: “[a] prisoner shall be placed on parole only when the board believes that he is able and willing to fulfill the obligations of a law-abiding citizen.”
¶79 The issue then is whether there is something about a defendant’s background which presents such a threat to society that the parole board should be precluded from ever considering whether that person can “fulfill the obligations of a law-abiding citizen.” In this case, the District Court concluded that no matter how long Vernon Kills On Top is incarcerated, and no matter how great the degree of his rehabilitation, the parole board should never be allowed to even consider his suitability for reentry to society because of the nature of his crime and the fact that no one can guarantee that he will never drink again.
¶80 Section 46-18-202(2), MCA (1987) provides that the District Court may restrict a Defendant’s eligibility for parole “[i]f the Court finds that the restriction is necessary for the protection of society....”
¶81 Section 46-18-404, MCA (1987) provides that Vernon Kills On Top was eligible to be designated a nondangerous offender if he did “not represent a substantial danger to other persons or society.” The District Court designated the Defendant in this case ineligible for parole based on its conclusion that his conduct was an integral part of the events leading to the victim’s death and because he did not prevent the victim’s death. The District Court designated the Defendant a dangerous offender because of his participation in the events leading to the victim’s death and because there was no testimony that the Defendant’s sobriety could be guaranteed in the future.
¶82 The District Court found as a fact that Defendant participated in the battering and robbery of the victim and used the victim’s credit *192 card to purchase gas. However, those findings are not supported by the record of the Defendant’s trial. After thorough review of that record, this Court pointed out that the State’s only witness:
[S]tated that at no time while Etchemendy was in the trunk of the group’s vehicle did Vernon ever strike him, injure him, or take anything of monetary value from him. She agreed that he never initiated talk of murder other than in response to Lester and then said ‘later.”
Kills On Top v. State (1996), 279 Mont. 384, 406, 928 P.2d 182, 196.
The only reliable evidence is that Diane Bull Coming confiscated Etchemendy’s credit card and that Diane and Lester cashed Etchemendy’s checks and divided the money. While a portion of the money was given to Vernon, he misplaced it, and even that portion was subsequently retrieved by Diane. Neither is the dissent correct when it repeats the allegation from this Court’s previous opinion that Vernon did nothing in the pre-murder stages to prevent the homicide. According to even Diane’s testimony, Vernon repeatedly stalled suggestions that Etchemendy be murdered.
Kills On Top, 279 Mont. at 408, 928 P.2d at 197.
¶83 The District Court, as did the dissent in Kills On Top v. State, clung to discredited facts reported in this Court’s original opinion found at State v. Vernon Kills On Top (1990), 243 Mont. 56, 793 P.2d 1273.
¶84 Upon thorough review of the actual record this Court concluded in Kills On Top II that:
Based on even Diane’s testimony, Vernon Kills On Top was not present when Etchemendy was killed, and he did not participate in any act which caused Etchemendy’s death. While she did testify that on two separate occasions he agreed that something would have to be done with the victim, she also testified that he sought to postpone any further harm to the victim and that after his expression of reluctance, she and Lester took the victim to another location where Lester performed the murderous act himself.
Kills On Top, 279 Mont. at 405, 928 P.2d at 195.
However, while Etchemendy was in the trunk, it was Vernon who let him out to go to the bathroom; Vernon who checked on his condition; and Vernon who incurred his brother’s wrath by removing Etchemendy’s blindfold so that he could go to the bathroom
Kills On Top, 279 Mont. at 408, 928 P.2d at 197.
¶85 Therefore, when the District Court concludes that no matter how long the Defendant has been imprisoned, and no matter the degree of his rehabilitation, he will still be “a substantial danger to *193 other persons” and his lifetime imprisonment is necessary for the “protection of society” and then bases those conclusions on findings that the Defendant battered and robbed his victim, used his credit card to purchase gas, and did nothing to avoid his death, the District Court’s conclusions were based on findings that are clearly erroneous.
¶86 Furthermore, the District Court’s conclusion that Defendant can never be eligible for release because no one can guarantee that he will never drink again is completely arbitrary, ignores the best evidence available regarding an alcoholic’s rehabilitation and condemns every criminal defendant who has ever had an associated drinking problem to a denial of parole.
¶87 No court could ever be presented with stronger evidence of an alcoholic’s rehabilitation than was presented to the District Court in this case. Four different chemical dependency or substance abuse counselors testified at the Defendant’s sentencing hearing. None expressed the remotest concern that Vernon Kills On Top would resume drinking if released from prison.
¶88 Miles Finly, a certified chemical dependency counselor at Montana State Prison described the Defendant as a positive role model for other inmates who would make a model citizen if released from prison.
¶89 Ginger Faver, who is also a certified chemical dependency counselor at Montana State Prison, described the Defendant as “an inspiration” to other inmates and stated that she “would be very comfortable having Vern be a neighbor.” She said that she trusted him and would have no qualms about his release from prison.
¶90 William Martin is a chemical dependency counselor at Montana State Prison. He described his selection of the Defendant as an assistant to help in the rehabilitation of others and explained that he has received treatment to help avoid relapsing to alcohol abuse that was unavailable outside the prison. He testified that his rehabilitation was “[a]s good as or as better as anybody else I have ever seen.” He described the Defendant as “head and shoulder above any inmate I know.” He stated that if released from prison the Defendant would be a “model citizen. I have no fear of him. He would be a wonderful man to be in our society. I believe that this man would save lives for what he has already gone through, and what he can do I think is just amazing.”
¶91 Ken Ingle is the Substance Abuse Program Supervisor at Montana State Prison, who has conducted close to 2000 alcohol assessments in parol and probation cases and 3500 alcohol assessments *194 overall. He testified that, “of the men that I met since I have been at Montana State Prison, Vern Kills On Top is what I hope that we, as taxpayers, can bring about through our correctional system.”
¶92 None of the alcohol or drug counselors to whom the Defendant has been exposed during the over ten years of his imprisonment gave the slightest suggestion that he would return to alcohol consumption if he was released from prison.
¶93 In addition to the counselors referred to in the preceding paragraphs, the bakery manager, with whom Defendant has worked during his incarceration, and his housing unit manager were called as witnesses. Other prison employees were interviewed as part of the presentence investigation. All were unanimous in their praise of the Defendant as a model inmate with no infractions in over ten years who performed a constructive role at the prison and who by all appearances has been rehabilitated from a life set in motion by his own childhood of abuse, neglect, and poverty, and his adulthood dependence on alcohol.
¶94 In sum, more could not have been shown to demonstrate that at least at some point in his life, Vernon Kills On Top should be allowed to appear before the parole board and give them the opportunity to consider whether after many years of imprisonment, rehabilitation, and positive contributions to the prison administration and the rehabilitation of other inmates he could be released “without detriment to the prisoner or to the community’ and “that he is able and willing to fulfill the obligations of a law abiding citizen.”
¶95 The District Court ignored the evidence presented at the Defendant’s sentencing hearing and resurrected discredited findings regarding the Defendant’s participation in the events which led to his imprisonment in order to support its conclusion that he should be ineligibile for parole. Therefore, I conclude that that conclusion was based on findings which are not supported by substantial evidence and are clearly erroneous. For the reasons set forth in this opinion, I dissent from the majoritys conclusion to the contrary. I would reverse the District Court’s determination that at no time during the remainder of his life, regardless of how he lives the remainder of his life, should Vernon Kills On Top be eligible to rejoin society.